PHIPPS et al. v. HARDING.

(Circuit Court of Appeals, Seventh Circuit. October 7, 1895.)

No. 211.

1. BILLS AND NOTES—PARTIES—GENERAL LAW.
By the general commercial law, parties who place their names on the back of a promissory note, before its delivery, for the purpose of giv-ing credit to the maker, are joint makers of the note, and will be so treated in the federal courts, though the note is made in a state whose courts hold such parties to be indorsers.

2. GENERAL COMMERCIAL LAW—RIGHT OF STATES TO CHANGE.
The several states are not without power to change, by statute, the general commercial law, but each state has the right to impose such conditions and limitations upon contracts, not inhibited by the term of its own or the federal constitution, as it may see proper.

3. SAME—MASSACHUSETTS STATUTE.
The Massachusetts statute (St. 1874, c. 404) providing that "all per-sons becoming parties to promissory notes payable on time, by signa-ture on the back thereof, shall be entitled to notice of non-payment thereof the same as endorsers," is a valid exercise of the power to change the general commercial law, and becomes a term of the contract, evidenced by a note made in Wisconsin, while such statute was in force, and delivered and payable in Massachusetts.

4. BILLS AND NOTES—INDORSERS—NOTICE—KNOWN INSOLVENCY OF MAKER.
The fact that the maker of a note is known by the indorser, at the time of the indorsement, to be insolvent, does not dispense with the necessity of notice to the indorser of the dishonor of the note.

5. SAME—DIRECTORS OF CORPORATION.

Nor does the fact that the indorsers constitute a majority of the board of directors of a corporation (the maker of the note) dispense with the necessity of such notice. Hull v. Myers, 16 S. E. 653, 90 Ga. 674, disapproved.

In Error to the Circuit Court of the United States for the Western District of Wisconsin.

This suit was brought to recover the amount of a promissory note executed by the Hudson Furniture Company (a corporation of the state of Wisconsin), dated Hudson, Wis., March 26, 1892, payable April 14, 1893, to the order of Edgar Harding, the defendant in error, for the sum of $5,000, payable at the North National Bank, Boston, Mass. Prior to its delivery or acceptance, the plaintiffs in error severally signed their names upon the back thereof for the purpose of giving credit to such note with the payee. It was thereupon sent by mail from Hudson, Wis., to the payee, at his residence in the state of Massachusetts, with the request that he would accept it in lieu of and in extension of a note of the Hudson Furniture Company for a like amount then held by him, and maturing at or about the date of the new note. It was received by the payee in the state of Massachusetts, and there accepted by him for the prior obligation of the company, upon the faith and security of the individual names upon the paper. The note was not paid at maturity. It was not properly protested for nonpayment, nor were the plaintiffs in error seasonably notified of its presentment and nonpayment. At the time of its execution and delivery, the Hudson Furniture Company was insolvent, to the knowledge of the plaintiffs in error, who were directors of the company, constituting the majority of its board of directors at the time of its execution, and so continued down to and after the maturity of the note.

By the statute of Massachusetts (St. 1874, c. 404) it is enacted that "all persons becoming parties to promissory notes payable on time, by signature on the back thereof, shall be entitled to notice of the non-payment thereof the same as endorsers."

The case was tried in the court below, without the intervention of a jury. The court found the facts as above stated, and, as conclusion of law upon such facts, held that the several individual defendants (plaintiffs in error here) were "joint and several makers of said note, and therefore not entitled to protest of said note," and judgment was rendered against all the defendants for the amount due upon the note.

It is assigned for error that the court erred in the following respects: (1) In the finding and decision of the said circuit court that at the time of the execution and delivery of the note upon which this action was brought to the plaintiff, the defendant, the Hudson Furniture Company, was insolvent; (2) in that the said court also found and decided that such insolvency was known by the defendants, Phipps, Coon, Jones, and Goss; (3) in the finding and decision of the said court that the said Phipps, Coon, Jones, and Goss signed the said note; (4) in the finding and decision of said court that said Phipps, Coon, Jones, and Goss were not entitled to protest of said note; (5) in the finding and decision that plaintiff recover from the defendants above named the amount due on said note, with interest and costs; (6) in the finding and decision of said court by which judgment is ordered according to the findings.

Charles P. Spooner and James P. Kerr, for plaintiffs in error.

M. H. Houtelle, for defendant in error.

Before WOODS and JENKINS, Circuit Judges, and BAKER, District Judge.

JENKINS, Circuit Judge, after stating the facts, delivered the opinion of the court.

We are not at liberty to review the evidence to ascertain whether the finding of the court below upon the facts was warranted by the testimony. We are restricted to the consideration of the question whether the facts as found support the judgment rendered. Jenks' Adm'r v. Stapp, 9 U. S. App. 34, 3 C. C. A. 244, and 52 Fed. 641. We must therefore consider the case upon the assumption that, at the time of the execution of the note, the Hudson Furniture Company was insolvent, to the knowledge of the individual parties to the note, who were its directors. Whether the term "insolvent," as employed in the findings, was used in the sense of inability to meet obligations as they mature, and in contradistinction to "bankruptcy," meaning an absolute inability to pay a debt, without respect to time,—a want of assets convertible into money sufficient to pay the debt,—it is not necessary for us to consider. It may be observed, however, that it appears from the record that this corporation continued a going concern after the making of the note, and until February 11, 1893, when, at a meeting of the stockholders of the company, it was resolved that owing to the large loss of the company in its business during the previous year, as disclosed by the treasurer's report, the board of directors was authorized to proceed at once to collect all outstanding accounts, sell the property of the company, and apply the proceeds to the payment of its debt, and generally to do every and all things necessary to wind up the affairs of the company at the earliest date practicable.

"Insolvency," in a popular sense, means "bankruptcy." There is, however, a state of insolvency which does not necessarily imply bankruptcy. This is true, doubtless, within the experience of most merchants and corporations engaged in trade. It is the incident of nearly every business that periods of depression are experienced, when there is a total inability to meet obligations as they mature; not from want of sufficient assets, but from inability to turn them presently into money for the payment of debts. That is a state of insolvency which, continuing, may ultimately result in bankruptcy. It, however, often occurs that by prudent management, well-directed energy, and by the indulgence of creditors, the business is kept upon its feet, and, with the advent of more prosperous times, at last reestablished upon a sure and solvent basis. We are unable to say in what sense the term "insolvent" was employed in these findings of fact. The history of the company, as we read it in the evidence, and as stated in the letter inclosing and asking acceptance of this note by Mr. Harding, indicates that the company was financially embarrassed, but that its directors hoped, through the indulgence of its creditors, to restore the company to a solvent condition, and to pay its notes after the end of the then current year. We have said this much, not that we deem the fact essential to a correct decision of the case, but simply to call attention to the necessity that, in findings of fact which are to be presented for review in this court, care should be taken that terms should not be employed which are susceptible of double or of doubtful interpretation. This is of importance, since we are without authority to review the evidence to ascertain the

sense in which terms are employed, or to declare the sense in which they should have been used.

It is settled doctrine that the federal courts, in the exercise of their co-ordinate jurisdiction, are not bound by the decisions of the state courts upon subjects of general law, but are at liberty to follow the convictions of their own judgment. Swift v. Tyson, 16 Pet. 1; Railroad Co. v. National Bank, 102 U. S. 14; Burgess v. Seligman, 107 U. S. 20, 2 Sup. Ct. 10; Myrick v. Railroad Co., 107 U. S. 102, 1 Sup. Ct. 425; Railway Co. v. Prentice, 147 U. S. 106, 13 Sup. Ct. 261. Therefore, notwithstanding it has been held by the supreme court of the state in which this note was executed that parties standing in like relation to bills and notes with the plaintiffs in error here are to be treated as indorsers (Blakeslee v. Hewitt, 76 Wis. 341, 44 N. W. 1105), the supreme court of the United States, in Good v. Martin, 95 U. S. 90, and Bendey v. Townsend, 109 U. S. 665, 667, 3 Sup. Ct. 482, has determined that they must be treated as joint makers of the note with the party who appears thereon as maker. And such is also the law of Massachusetts. Bank v. Willis, 8 Metc. (Mass.) 504; Brown v. Butler, 99 Mass. 179; Way v. Butterworth, 108 Mass. 509; Allen v. Brown, 124 Mass. 77. We are therefore constrained to hold that the plaintiffs in error were joint makers with the Hudson Furniture Company of this note, and, if the contract is to be controlled by the law of the state of Wisconsin, were not entitled to notice of protest. Being joint makers of the note, their liability is controlled by the law of the place where the contract is payable, because they are deemed to have reference to the law of such place in the construction of the obligation assumed. Brabston v. Gibson, 9 How. 263, 277; Supervisors v. Galbraith, 99 U. S. 214, 218; Pierce v. Indseth, 106 U. S. 546, 1 Sup. Ct. 418; 1 Daniel, Neg. Inst. (4th Ed.) § 895. It would be otherwise with respect to the indorser of a note, for he is treated as in fact entering into a new obligation, undertaking that the maker will pay at the time and place stipulated, and that he (the indorser) will respond to his obligation at the place of the execution of his indorsement, if there delivered, in the event of dishonor and notice. If delivered at a place other than at the place of execution, the law of the place where delivered controls. Daniel, Neg. Inst. §§ 868, 899; Slacum v. Pomeroy, 6 Cranch, 221; Musson v. Lake, 4 How. 262. The plaintiffs in error thus being joint makers of a note payable and delivered in the state of Massachusetts, their obligation is to be judged by the law of that state.

We are therefore brought to the inquiry whether the statute of that state to which reference has been made is operative to clothe the joint makers with the rights to notice of protest that an indorser is entitled to. This statute manifestly regards all parties to a note by signature on the back thereof, whether they were to be treated as guarantors or as joint makers, in the light of sureties for the maker, and recognizes the equitable right of such parties to notice of dishonor of the note by their principal. It sought to place them, with respect to presentment, demand, and notice of dishonor, upon the same footing with an indorser. The statute was thus con-

strued by the supreme judicial court of that commonwealth in Bank v. Law, 127 Mass. 72, prior to the execution of the contract in question. We are, of course, bound by that construction. Louisville, N. O. & T. Ry. Co. v. Mississippi, 133 U. S. 587, 10 Sup. Ct. 348; Baltimore Traction Co. v. Baltimore Belt R. Co., 151 U. S. 137, 14 Sup. Ct. 294. So that, assuming the validity of that statute, any one becoming a party to a note payable on time by signature on the back thereof, whether he be treated as guarantor or joint maker, is in fact a mere surety for the maker; his liability is conditional and secondary; and before he can be charged, he must have the same notice of protest that an indorser by the law merchant would be entitled to under like circumstances. He stands in this respect in the shoes of an indorser. The statute entered into and is a term of the contract. The. engagement of the plaintiffs in error, therefore, was that if, upon due demand, the note should not be paid according to its tenor, they would compensate the holder or a subsequent indorser who was compelled to pay, provided the requisite proceedings on dishonor were duly taken.

It is urged, however, that we must disregard this statute; and, in support of this contention, the broad doctrine is asserted that the several states of this Union have no right by statute to change the general commercial law. This contention is rested upon certain observations of justices delivering the opinions of the court in Swift v. Tyson, 16 Pet. 1, 18, and Watson v. Tarpley, 18 How. 517, 521. In the former case it is said:

"In all the various cases which have hitherto come before us for decision, this court have uniformly supposed that the true interpretation of the 34th section limited its application to state laws strictly local; that is to say, to the positive statutes of the state, and the construction thereof adopted by the local tribunals, and to rights and titles to things having a permanent locality, such as the rights and titles to real estate, and other matters immovable and intraterritorial in their nature and character. It never has been supposed by us that the section did apply, or was designed to apply, to questions of a more general nature, not at all dependent upon local statutes or local usages of a fixed and permanent operation; as, for example, to the construction of ordinary contracts or other written instruments, and especially to questions of general commercial law, where the state tribunals are called upon to perform the like functions as ourselves; that is, to ascertain, upon general reasoning and legal analogies, what is the true exposition of the contract or instrument, or what is the just rule furnished by the principles of commercial law to govern the case. And we have not now the slightest difficulty in holding that this section, upon its true intendment and construction, is strictly limited to local statutes and local usages of the character before stated, and does not extend to contracts and other instruments of a commercial nature, the true interpretation and effect whereof are to be sought, not in the decisions of the local tribunals, but in the general principles and doctrines of commercial jurisprudence. Undoubtedly, the decisions of the local tribunals upon such subjects are entitled to; and will receive, the most deliberate attention and respect of this court; but they cannot furnish positive rules or conclusive authority by which our own judgments are to be bound up and governed. The law respecting negotiable instruments may be truly declared, in the language of Cicero, adopted by Lord Mansfield in Luke v. Lyde, 2 Burrows, 882, 887, to be in a great measure, not the law of a single country only, but of the commercial world."

In the latter case the observation which is supposed to warrant the asserted restriction upon the rights of the states is as follows:

"The general commercial law being circumscribed within no local limits, nor committed for its administration to any peculiar jurisdiction, and the constitution and the laws of the United States having conferred upon the citizens of the several states, and upon aliens, the power or privilege of litigating and enforcing their rights acquired under and defined by that general commercial law before the judicial tribunals of the United States, it must follow, by regular consequence, that any state law or regulation the effect of which would be to impair the rights thus secured, or to divest the federal courts of cognizance thereof, in their fullest acceptation under the commercial law, must be nugatory and unavailing. The statute of Mississippi, so far as it may be understood to deny, or in any degree to impair, the right of a nonresident holder of a bill of exchange, immediately after presentment to, and refusal to accept by, the drawee, and after protest and notice, to resort forthwith to the courts of the United States by suit upon such bill, must be regarded as wholly without authority and inoperative. The same want of authority may be affirmed of a provision of the statute which would seek to render the right of recovery by the holder, after regular presentment and protest, and notice of nonacceptance, dependent upon proof of subsequent presentment, protest, and notice for nonpayment. A requisition like this would be a violation of the general commercial law, which the state would have no power to impose, and which the courts of the United States would be bound to disregard."

It may not be denied that the language employed gives color of authority to the pretension. It is therefore necessary to ascertain the precise questions there involved, in order to discover whether the remarks quoted were pertinent to the subject under discussion, and necessary to be determined, and so authoritative and binding upon us as decisions of the court. In the former case the question was whether a certain defense to a bill of exchange, being a contract made within the state of New York, and governed by its law, was available; and this contention was rested upon the ground that the courts of New York had decided affirmatively upon that question. The supreme court held—First, that the question had never been definitely determined in the courts of that state; and, secondly, if it had been so determined, the decision would not be binding upon the federal courts with respect to principles established in the general commercial law, under the thirty-fourth section of the judiciary act 1789; that decisions of the state courts do not constitute laws within the meaning of the act, but are merely evidence of what the laws are; and that the term "law," as there used, refers to the acts of the legislature or long-established local customs having the force of law. It is to be observed that the judgment in that case was carefully limited to the effect of decisions of local tribunals. Mr. Justice Story, delivering the opinion, remarks with respect to the facts of the case that "it is observable that the courts of New York do not found their decisions upon any local statute or positive, fixed, or ancient local usage, but they adduce the doctrine from the general principles of commercial law." The decision in the case upon the precise question presented is now universally recognized as correct, but whatever was said with respect to local statutes and their effect was upon a question not involved in the case. The language of Cicero, adopted by Lord Mansfield, and quoted by Mr. Justice Story, is un-

doubtedly correct,—that the law of negotiable instruments is in a great measure not the law of a single country only, but of the commercial world. That was the statement of an historical fact, as true to-day as in the time of Cicero. The underlying principles of the commercial law are the same in all commercial countries; but, as matter of fact, the customs and laws of the various commercial nations differ widely with respect to negotiable paper. The law-merchant, as we have received it from the common law, grew out of the customs of the merchants of London, and in many essential particulars is at variance with the commercial law of continental Europe. The language quoted from Cicero by no means suggests, nor is it true, that it is beyond the power of each sovereignty to change the commercial law to suit its pleasure. In the latter case, of Watson v. Tarpley, a statute of the state of Mississippi provided that "no action or suit shall be sustained or commenced on any bill of exchange until after the maturity thereof." This statute was invoked in defense of an action in the federal court prior to the maturity of the bill against the drawer of the bill upon protest for non-acceptance. A question in the case was whether the statute of a state could thus restrict the right of a party to pursue his suit in a federal court. The court held adversely upon that question. It is to be noted that the statute relied upon did not go to the question of liability upon the contract, nor impose any new term upon commercial contracts, but merely affected the remedy thereon, postponing suit until after maturity of the bill. The decision was certainly correct, because no state statute can thus control the remedy of a suitor in a federal court.

The observations referred to in both the cases were certainly obiter so far as they seem to imply or can be properly construed as holding that a state is without power with respect to contracts made within its jurisdiction, and controlled by its law. In view of the eminent learning of the distinguished jurists referred to, their observations are to be treated with great deference; but, if susceptible of the meaning contended for, they cannot be held to declare the settled law of the land without determination of the question by the supreme court in a cause wherein the question was involved and necessary to be decided.

There are a number of decisions of the supreme court which distinctly recognize the right of such legislation by the state. Thus, in Bank v. Donnally, 8 Pet. 361, it is asserted that:

"The general principles adopted by civilized nations is that the nature, validity, and interpretation of contracts are to be governed by the law of the country where the contracts are made or are to be performed [the remedy being governed by the lex fori]."

In Musson v. Lake, 4 How. 262, 278, the question being whether the contract between the holder and indorser of the bill in controversy was to be governed by the law of Louisiana, where the bill was payable, or by the law of Mississippi, where it was drawn and indorsed, the court say:

"This part of the contract was, by the agreement of the parties, to be performed in Mississippi, where the suit was brought and is now depending.

The construction of the contract and the diligence necessary to be used by the plaintiffs to entitle them to a recovery must therefore be governed by the law of the latter state."

In Railroad Co. v. National Bank, supra, Mr. Justice Harlan speaking for the court, observes (page 25):

"According to the very general concurrence of judicial authority in this country as well as elsewhere, it may be regarded as settled in commercial jurisprudence, there being no statutory regulations to the contrary, that when negotiable paper is received," etc.

And so in Railway Co. v. Prentice, 147 U. S. 101, 13 Sup. Ct. 261, Mr. Justice Gray, delivering the opinion of the court, remarks upon the question then under consideration that:

"It is a question, not of local law, but of general jurisprudence, upon which this court, in the absence of express statute regulating the subject, will exercise its own judgment, uncontrolled by the decisions of the courts of the various states."

The contention that this statute of Massachusetts is invalid and inoperative goes to the extent of depriving a state of power to legislate with respect to the law merchant. It presents a bold and far-reaching proposition, striking at the root of power in the respective states to which we are not prepared to yield assent. We are referred to no provision of the constitution which expressly or impliedly inhibits the exercise of such power by the state. The contention assumes that there is a commercial law of the United States distinct from and independent of the law of the states. Whence came it, and how was it adopted? Was it the common law of England or the civil law of continental Europe? Was it a law appropriated by the nation upon the adoption of the constitution? It must then be universal in its application throughout the nation, overriding all state laws upon the subject and all right of the states to legislate. We know that most of the states are governed by the common law of England as modified and adapted to the peculiar circumstances and conditions of each, and that one state, at least, is governed by the civil law. And we know, moreover, that the commercial law existing in these various states, while alike with regard to underlying principles, is widely different in many essential respects. There is no common law of the United States, except possibly as the common law of England has been adopted with reference to the construction of powers granted to the federal union.

This subject received the consideration of the court in Smith v. Alabama, 124 U. S. 465, 478, 8 Sup. Ct. 564, and was there determined, Mr. Justice Matthews, speaking for the court, saying:

"There is no common law of the United States, in the sense of a national customary law, distinct from the common law of England as adopted by the several states each for itself, applied as its local law, and subject to such alteration as may be provided by its own statute. Wheaton v. Peters, 8 Pet. 591. A determination in a given case of what that law is may be different in a court of the United States from that which prevails in the judicial tribunals of a particular state. This arises from the circumstances that the courts of the United States, in cases within their jurisdiction, where they are called upon to administer the law of the state in which they sit, or by which the transaction is governed, exercise an independent though concurrent jurisdiction, and are required to ascertain and declare the law

according to their own judgment. This is illustrated by the case of Railroad Co. v. Lockwood, 17 Wall. 357, where the common law prevailing in the state of New York, in reference to the liability of common carriers for negligence, received a different interpretation from that placed upon it by the judicial tribunals of the state; but the law as applied was none the less the law of that state. In cases, also, arising under the lex mercatoria, or law merchant, by reason of its international character, this court has held itself less bound by the decisions of the state courts than in other cases. Swift v. Tyson, 16 Pet. 1; Carpenter v. Insurance Co., Id. 495; Oates v. Bank, 100 U. S. 239; Railroad Co. v. National Bank, 102 U. S. 14. There is, however, one clear exception to the statement that there is no national common law. The interpretation of the constitution of the United States is necessarily influenced by the fact that its provisions are framed in the language of the English common law, and are to be read in the light of its history. The code of constitutional and statutory construction which, therefore, is gradually formed by the judgments of this court, in the application of the constitution and the laws and treaties made in pursuance thereof, has for its basis so much of the common law as may be implied in the subject, and constitutes a common law resting on national authority. Moore v. U. S. 91 U. S. 270."

Mr. Daniel, in his valuable treatise upon the law of Negotiable Instruments (sections 863 and 864), defines the principle which should rule the question in the following explicit language:

"Each one of the United States is, in contemplation of its own and of the federal constitution, a distinct and independent sovereignty, with its own peculiar code of laws and system of judicature. And while, in the aggregate, they compose one integral confederacy, which is itself an independent nation, paramount in certain respects to the states, in all other respects the states retain their separate autonomies, and are deemed as much foreign to each other as if not in any wise associated together. The regulation of contracts comes peculiarly within the province of the states, and therefore contracts between citizens of the different states, while they may be enforced by process in the federal courts, nevertheless are to be construed and effectuated, not by a general system of laws which overspread the whole country, but in accordance with the principles of international law which govern transactions between parties of different nations.

"Sec. 864. As long as all the parties to a bill or note are confined within the limits of a single state, the local law alone determines their rights and liabilities. No suit can be brought in a federal court, and any question which may be litigated begins and ends with the local tribunals. But the vast and constant traffic between the states, and the general use of bills and notes as a medium of exchange, give circulation to those instruments from hand to hand, and from state to state; and questions of nicety are often presented in the inquiry by what law the rights and liabilities of the parties are to be ascertained. In some of the states, as in Maryland, the English statute of 3 & 4 Anne is in force. In others, as in Virginia, where none but notes payable at bank are negotiable, there are peculiar statutory provisions respecting commercial paper. In all of the states each recognizes the precedents of its own courts, as independently of the rulings of the supreme court of the United States as of those of Great Britain, which may, indeed, shed great light on all commercial questions, but are of no binding authority. When suit is brought in one of the federal courts, it, on the other hand, will be guided by the general law merchant in questions referable to it, and will follow its own views about it, unless the nature of the liability contracted has already been determined, in the particular state of the contract, at the time it was entered into."

We are of opinion that these principles are not shaken by the obiter dicta to which reference has been made. It will thus be seen that, in the exercise of the concurrent jurisdiction of the federal court with respect to all contracts not within the exclusive control of the federal

government, we administer the law of the state which controls the contract, and that each state has the right to impose such conditions and limitations upon contracts, not inhibited by the terms of its own or the federal constitution, as it may see proper. It is, of course, most desirable that there should be uniformity of laws with respect to commercial paper,—a necessity becoming more and more emphasized day by day, and which may possibly result in the grant of exclusive control of the subject to the federal government. It is not, however, within our provinces to bring about such a result, however desirable. We are constrained to hold that the act of Massachusetts here in question was a valid exercise of power, and became a term of this contract. The nature of the liability at the time of the making of the contract was declared by the statute law of the state of the contract, and we must construe the contract in the light of such statute law.

We are thus brought to the question whether the known insolvency of the maker at the time of the execution of the note, and the fact that the plaintiffs in error were directors, constituting a majority of the board of directors, of the maker of the note, obviate the necessity of presentment of the note for payment, and the giving of seasonable notice of dishonor. The contract of the parties was conditional. It was, as we have seen, that if, upon due demand, the note should not be paid by the corporation, according to its tenor, they would compensate the holder, or a subsequent indorser who is compelled to pay, provided the requisite proceedings for dishonor were duly taken. That there should be demand of payment and notice of dishonor were terms incorporated into this contract. Rothschild v. Currie, 1 Adol. & E. (N. S.) 43. The reason of the condition imposed by the law, doubtless, was that the indorser might take prompt measures for his security, and the law presumed injury from want of notice of dishonor. This presumption is certainly not refuted by proof of the solvency of the maker evidencing that no injury resulted from want of notice to the indorser. It is said, however, that insolvency known to the indorser dispenses with the necessity of notice, because nothing could be lost by default of demand and notice. We are not prepared to concur in the conclusion of fact. We have said that the solvency of the maker, when no possible loss could result to the indorser from want of notice, will not excuse failure to advise of dishonor. Certainly, in the case of insolvency notice is more essential, that the party to be charged may take prompt measures for his security. The insolvency of the maker might possibly affect the sufficiency of indemnity, but it would not necessarily result in a total failure of redress. That would be dependent upon the extent of the insolvency. There have been cases, invested with peculiar equities, in which courts have sought to evade this wholesome rule of the common law, and in which they have permitted evidence of no injury to excuse notice. We are not prepared to follow a rule that will tend to confusion in commercial law in order to relieve a supposed hardship. We concur with the supreme court of Massachusetts in Farnam v. Fowle, 12 Mass. 89, 92, that "the hardship,

if any, arises from a fluctuation of opinion and an uncertainty as to rules, and seldom from an inflexible adherence to them, because, when it is once known that exactness in the performance of duty is to be required, parties will adapt themselves to such a state of things, and be always diligent and punctual to avail themselves of their contracts." And we concur with Mr. Daniel (Daniel, Neg. Inst. § 1134) that it is "a total misconception of the obligation of an indorser to place his liability at all upon any question involving the pecuniary circumstances of his principal." Hardship is more likely to happen from speculation of courts and juries in the determination of the question of fact whether injury has or not resulted from want of notice than from strict adherence to the law and to the terms of the contract. The better opinion is, and, as we think, the settled doctrine of this country is, that insolvency is no excuse for failure of notice of dishonor. French's Ex'x v. Bank, 4 Cranch, 141; Wilson v. Senier, 14 Wis. 380; Sanford v. Dillaway, 10 Mass. 52; Farnam v. Fowle, 12 Mass. 89; Bank v. Ayers, 16 Pick. 392; Bank v. Spencer, 6 Metc. (Mass.) 308.

Nor do we think that the fact that the plaintiffs in error were directors and constituted a majority of the board of directors of the maker of the note is matter of moment or excuses failure of notice. The case of Hull v. Myers, 90 Ga. 674, 16 S. E. 653, is urged upon our attention in support of this contention. The decision of the court upon this question is bottomed, as we think, upon incorrect reasoning, and is without the support of authority. The court say:

"Though the debt is his, and not their own, primarily, yet, having all his assets and full power over them and over all his business, they are bound to know all that he would be bound to know were his business and assets in his own hands and under his own management."

If we grant this, we have already seen that the settled law of the land is that knowledge by the indorser of the solvency or insolvency of the maker will not excuse want of notice. The court further observes:

"In this instance, the principal being a corporation, and the indorsers the corporate directors, the latter could have no right or reason to expect that funds would be provided for liquidating the debt, unless it was done by their procurement or through their agency."

This is true if it means that the funds to meet the note are in a sense to be procured through and appropriated to the debt by the agency of the board of directors; but it is not necessarily true if it means that the funds are to be procured through the agency of the indorsers of the note. Their contract is personal and individual, and is not affected by their official relation to the company. The directors, in the management of the property of a corporation, have no duty imposed upon them or upon any member of the board to furnish funds for the uses of the corporation, save such as arise from the fact that the property of the corporation is committed to their care. Unless knowledge by the indorser of the insolvency of the maker of a note can avail to dispense with the necessity of a notice, we are

unable to approve this decision. The defect in its reasoning seems apparent from the following clause:

"A single director, or even a minority of the directors, indorsing a note for the corporation, might be entitled to notice of dishonor, for one only, or a small number, might have a right to suppose that the note would be attended to at maturity; but, when the whole board or a majority of its members unite in the indorsement, each and all so indorsing should be charged with the duty and responsibility of protecting the paper, since the power to control the conduct of the corporation in respect to paying or not paying would be in their own hands."

It seems a curious conclusion that, because the note is indorsed by a majority of the board of directors, therefore the individual liability of each is fixed, and want of notice of dishonor excused, upon the ground that they should act together as a majority, and so could appropriate funds of the corporation to the payment of the note. The argument assumes that they must act together as a majority of the board of directors; that there are funds of the corporation which should have been applied to the payment of the note, and were not applied, because of the non-action by the indorsers. The argument concedes that, if the note were indorsed by a minority of the directors, failure to give notice would not be excused. But by what right does the court assume that the majority of the directors indorsing the note will or should act together as a majority in the board upon any question affecting the interests of the company? The argument proceeds upon the theory that they should act in their own interest to protect their liability, and possibly in opposition to the interests of creditors. We think the case is founded upon a mistaken notion of the duties and obligations of directors. They are only to administer the property of the corporation as they find it. They are not obliged to furnish funds for the use of their principal, nor ought they, as directors, to protect their individual interests against the interests of their principal. It is, moreover, to be observed that, in the case we have now in hand, the body of the stockholders, some two months prior to the maturity of this note, directed the officers of the company to wind up the affairs of the company at the earliest date practicable, to collect all its assets, sell all its property, and apply the proceeds to the payment of the debts of the company. The corporation then ceased to be a going concern.

We have held in Manufacturing Co. v. Hutchinson, 11 C. C. A. 320, 63 Fed. 496, that:

"When a private corporation is dissolved, or becomes insolvent, and determines to discontinue the prosecution of business, its property is thereafter affected by an equitable lien or trust for the benefit of creditors. The duty in such cases of preserving it for creditors rests upon the directors or officers to whom has been committed the authority to control and manage its affairs. Although such directors and officers are not technical trustees, they hold, in respect of the property under their control, a fiduciary relation to creditors; and necessarily, in the disposition of the property of an insolvent corporation, all creditors are equal in right, unless preference or priority has been legally given by statute or by the act of the corporation to particular creditors."

It would have been a violation of duty for the plaintiffs in error, as directors of the company, after this resolution of the stockholders,

to have sought to apply the assets of the corporation to the payment of this particular debt for which they were conditionally liable, and thus to relieve themselves of liability, to the detriment of the general creditors of the company. Their duty was to refrain from applying the assets of the corporation to the payment of this note if the assets of the corporation were insufficient to pay all debts in full. Their power by the resolution became limited, and their duty was to marshal all the assets of the corporation, and apportion them ratably among all the creditors of the corporation according to their equality of right. They could not legally have done that which the supreme court of Georgia, in the case referred to, holds that they should have done, and failure so to do wrought legal excuse for failure of duty on the part of the holder of the note. In this respect this case is distinguishable from the case of Hull v. Myers.

The court below held that the plaintiffs in error were joint makers of the note, and therefore not entitled to notice of protest. We have seen that, by the law of Massachusetts which governs this contract, they were entitled to notice, notwithstanding that relation to the paper. We hold that failure of notice is not excused by anything apparent on the record, and that the plaintiffs in error are discharged from liability upon the paper by reason of failure of proper demand and of seasonable notice of dishonor.

The judgment will be reversed, and the cause remanded, with directions to the court below to render judgment for the plaintiffs in error upon the findings.