HERMITAGE NATIONAL BANK *v.* CARPENTER.

(*Nashville.*  December Term, 1914.)

1. **PRINCIPAL AND SURETY.  Discharge of surety.  Diversion to an unauthorized purpose.**

Where defendant's testator became surety with M. on notes of a new corporation organized by M., under an agreement with the payee bank that the proceeds of one of the notes was to be used in paying a specified indebtedness of an insolvent corporation, and the other was to be used to furnish capital for the operation of the new corporation, and about one-half of the proceeds of the second note were diverted without the consent of the surety by the bank or with its knowledge to the payment of other debts of the insolvent corporation to the bank, so that the new corporation soon failed for want of capital, the surety was thereby discharged from liability on that note.  (*Post, pp.* 141-147.)

Cases cited and distinguished:  Benjamin v. Rogers, 126 N. Y., 60; Gano v. Farmers' Bank, 103 Ky., 508; Crossley v. Stanley, 112 Iowa, 24.

Cases cited and approved:  Perkins v. Ament, 39 Tenn., 110; Hickerson v. Raiguel, 49 Tenn., 329; Russell v. Ballard, 16 B. Mon. (Ky.), 201; Ham v. Greve, 34 Ind., 18; Planters' State Bank v. Schlamp, 124 Ky., 295; Haworth v. Crosby, 120 Iowa, 612; Altoona Bank v. Dunn, 151 Pa., 228; Petefish v. Watkins, 124 Ill., 384; Chaffe v. Taliaferro, 58 Miss., 544; Lee v. Bank, 2 Sandf. Ch. (N. Y.), 311; Hefferlin v. Krieger, 19 Mont., 123.

2. **PRINCIPAL AND SURETY.  Discharge of surety.  Diversion to an unauthorized purpose.  Mode of diversion.**

The fact that some of the proceeds of the note were not charged off by the bank against the indebtedness of the insolvent corporation, but checks were drawn against them by M., as president of the new corporation, to pay the indebtedness of the

old, does not entitle the bank to hold the surety.  (*Post, pp.* 147, 148.)

3. **PRINCIPAL AND SURETY.    Discharge of surety.    Diversion to an unauthorized purpose.    Consent of surety.**

One who became surety on a note to raise capital for a new corporation is not released from liability for so much of the proceeds of the note as were diverted to the payment of the debts of another corporation with the consent of the surety. (*Post, p.* 148.)

FROM DAVIDSON.

Appeal from the Chancery Court of Davidson County.—JOHN ALLISON, Chancellor.

JNO T. LELLYETT, for appellant.

HOLDING & GARNER, for appellee.

MR. JUSTICE WILLIAMS delivered the opinion of the Court.

The McLemore Grain Company, a body corporate (for convenience referred to at places in this opinion as the old company) about the first of the year 1910 opened an account with the Hermitage National Bank of Nashville.  It also did business with the Fourth National Bank of the same city.

The grain company became debtor to the Hermitage Bank by notes, some secured by personal indorsement, and some by collateral security, and also by way of overdraft, so that on April 1, 1910, a considerable

aggregate of obligations existed. These are referred to below as old-company obligations.

On that day that company's indebtedness to the bank was unexpectedly swelled, and insolvency confronted the grain company. This condition was precipitated by the fact that $4,500 of the checks of the grain company which had been drawn on the Fourth National Bank, and which had been cashed by complainant bank, were upon presentation dishonored by the drawee bank.

Cheairs, the cashier of complainant bank, anxious to secure his bank against loss, called upon J. B. McLemore, president of the grain company, to make good the amount of these dishonored checks. As the result of a conference between cashier Cheairs, McLemore, and the father-in-law of the latter, a plan was devised to put McLemore in a position to continue in business and to obtain for the bank security, by way of personal indorsement, for the $4,500 of unpaid checks. McLemore's father-in-law it was expected would aid by becoming indorser, but he declined to commit himself to the considerable extent that was required. It was proposed by one of those in the conference that a new corporation be organized to do a grain and hay business to which complainant bank should make a loan of $7,500 on which to conduct the business; such loan to be carried until the $4,500 could be paid off at the rate of $300 per month, provided the total of $12,000 could be secured to the satisfaction of the bank.

W. J. Howard, a resident of Columbia, Tenn., a boyhood friend of McLemore, who had himself lived in Columbia before he removed to Nashville (as had also cashier Cheairs), was thought of as a prospective indorser for the new company. Howard was a man of means, and had to a very considerable extent theretofore aided McLemore in his business ventures.

On April 3d McLemore went to Columbia and had a conference with Howard and outlined the scheme to him, with result that Howard consented to indorse the required notes. Steps were taken to obtain a charter for the new company under the style of McLemore Grain & Hay Company. A number of contracts in blank, notes, etc., were prepared to be taken by McLemore on a second trip the following day to Columbia, on which visit he was accompanied by Cheairs. The scheme, in object and outline, was again canvassed by both of the visitors with Howard, who signed the series of notes and also the contracts which were in the form of letters addressed to the complainant bank.

Among the instruments prepared for Howard's signature in advance of the trip to Columbia was the following, written on a letter head of Hermitage National Bank by its cashier, evidently after consultation with other officials of the bank:

"Nashville, Tenn., 4-4-10.

"Mr. N. F. Cheairs, Cashier, Hermitage National Bank, Nashville, Tenn.—Dear Sir: You hold unpaid checks of the McLemore Grain Co. for approximately

$4,500. In consideration of your advancing a new company to be organized $7,500 upon a note of the new company with the personal indorsement of J. B. McLemore and myself, I agree to indorse notes covering $4,500 with the understanding that said indebtedness will be liquidated at the rate of $300 per month, and that the note for $7,500 as above referred to, will be carried by you until after the $4,500 indebtedness, which is payable at the rate of $300 per month has been paid. In the event any monthly payment of $300 is not made, the entire amount on which I am indorser will become due and payable after thirty days' notice and demand.

"Yours truly,          [Signed]   W. J. HOWARD."

The proof shows that the understanding of those in charge of the negotiation and execution of this obligation was, as explained by Cheairs: The proceeds of the $7,500 note were to go to the credit of the new company. On these proceeds the new company was to prosecute a new business, with the exception of the sum of $1,500, which was to be applied by the bank in payment of a note of that sum due to the bank by the old company on which Howard's name was signed as surety.

Cheairs says that Howard's friendship for McLemore and his desire to see McLemore get on his feet again, financially, induced him to sign the papers presented to him; that is, it is further explained, Howard's name was lent in suretyship with the purpose of enabling McLemore to operate "his new business and

make enough to pay off these loans at the rate of $300 per month.''

We think it apparent from this record that Cheairs purposely made and caused to be left the impression on Howard that both Howard and the bank, through Cheairs, its cashier, would co-operate in enabling Mc-Lemore, a fellow, Maury Countian, and friend of both Howard and Cheairs, to recover himself financially through the medium of a new company equipped with a fresh capital of $6,000 net, as above indicated.

However, it appears that this scheme was materially departed from by the bank to the detriment of Howard. We believe it is fairly inferable from the facts in evidence that to save himself from criticism in allowing the old company to get so deeply into his bank's debt, and certainly under temptation to save the bank presently, Cheairs began to divert and to knowingly take the benefit of diversions of the capital of the new company to the payment of obligations of the old company, which, as they matured, proved embarrassing to a national bank. We find that more than one-half of the $6,000 was thus diverted. The result was, of course, the strangling of the new company, which survived only about three months.

Under these circumstances, is the bank entitled to hold Howard to respond as surety?

The doctrine of diversion in the law of suretyship, relating to the release of the surety, is, broadly speaking, to the effect: If one becomes surety on a note for a specified purpose, according to the agreement

of the parties, he is not liable if it is used for a different purpose without his consent to one chargeable with knowledge of that purpose and of the diversion.

The diversion may have one of several aspects. The misuse oftentimes is of the note itself, as an instrument. And herein the diversion may be one from the intended payee to another not in the contemplation of the surety. The cases of *Perkins* v. *Ament,* 2 Head (39 Tenn.), 110, and *Hickerson* v. *Raiguel,* 2 Heisk. (49 Tenn.), 329, 334, are illustrative of this class of cases in their holding that, if a party becomes surety on a note with the understanding that it shall be passed to a particular individual, and to no one else, he is not liable unless the note is passed to that person.

The diversion may take the form of the instrument, as such, being improperly applied after a due lodgment in the hands of the payee; thus, a note executed by a surety for use as collateral security for an existing debt, and used to obtain additional credit, or a note executed to enable the principal obligor to obtain future credit, but applied on an existing debt of the principal. *Russell* v. *Ballard,* 16 B. Mon. (Ky.), 201, 63 Am. Dec., 526; *Ham* v. *Greve,* 34 Ind., 18; 32 Cyc., 186.

Perhaps the clearest statement of the rule is that of the court of appeals of New York in *Benjamin* v. *Rogers,* 126 N. Y., 60, 26 N. E., 970. In that case Calkins was the principal or maker of the note there involved. Miss Petit the payee, and Crandall an accommodation surety. The note was diverted from the

intended payee, and also from the puropse for which it was executed. The court said:

"An accommodation maker of a note, or one who becomes surety upon a note, has a right to determine for himself what use shall be made of the note which he signs. He may impose material or immaterial conditions or terms, and no person, as against him, can get title to the note who takes it with full knowledge, in violation of the terms and conditions imposed upon it by him. . . . Calkins was a business man, and Crandall may have been willing to sign this note to enable him to raise money to be used in his business, while unwilling to sign it if it was to be used to pay an antecedent debt. There may have been something in his relations with Miss Petit that made it more desirable to him that she should hold the note, rather than some other person. He is long since dead, and cannot explain why it was that he was willing to sign the note for the special purpose named, and for no other purpose. Suffice it to say that he did make it for that purpose, and so the plaintiff was notified at the time he took it. As to him, therefore, the note never had any inception, and there can be no recovery against his executor; and we believe that no authority can be found, either in this country or in England, where it has been held that a plaintiff can recover under such circumstances."

The diversion which may effect the release of the surety need not be that of the instrument itself. A misapplication of the proceeds of a note or contract

works the same result. There could be no distinction taken as between the two phases that would have substance for a basis. None is taken or attempted in any reported case to which our attention has been called.

In the case of *Gano* v. *Farmers' Bank,* 103 Ky., 508, 45 S. W., 519, 82 Am. St. Rep., 596, it appeared that in order to aid Pullen, who stood in need of capital to successfully run his business, Gano and nine others, as sureties, entered into an obligation to secure an advance to Pullen of $10,000. The bank, with knowledge of the nature and purpose of the obligation, furnished $5,000 to Pullen for use in his business, but the proceeds of a note representing the other $5,000 were taken to pay off a pre-existing debt of Pullen to the bank. In holding Gano released as surety, on his appeal, the court said:

"It is therefore insisted for the appellant that the principal announced in *Russell* v. *Ballard,* 16 B. Mon. [Ky.], 205 [63 Am. Dec., 526], is applicable here, and, when applied, the surety stands discharged. It was there said: 'If a note be purchased by a party, with notice that one of the obligors is surety merely, and that the sale and purchase will defeat the purpose for which it was executed by him, or will violate any understanding or agreements between him and his principal, then the purchaser will be affected by such notice, and cannot hold the surety liable on the note to compel him to pay it.'

"Here the bank has notice that Gano is surety merely on the writing taken as collateral by the bank

to secure the new note, and it had notice that the sale and purchase of this new note and application of its preceeds to pay off the old debt would defeat the sole purpose for which the writing was executed by the surety, namely, 'to raise the sum of $10,000, buy stock, and run the same.'

"This would seem sufficient to bring the case within the principle announced in the cited case. For it is manifest that, if one-half the capital needed to carry on the milling business and 'run the same successfully' was to be taken to pay off an old debt, the business must suffer, and likely not be run successfully."

And see, in accord, *Planters' State Bank* v. *Schlamp*, 124 Ky., 295, 99 S. W., 216.

In the case of *Crossley* v. *Stanley*, 112 Iowa, 24, 83 N. W., 806, 84 Am. St. Rep., 321, it appears that the money was borrowed, and the sureties signed, to enable the principal to continue in his business of grain buying, which fact was known to the payee; and it is stated that the diversion was of the proceeds of the note. The court, in holding that the surety was discharged, said:

"It is manifest that the sureties had an interest in the use of the money as proposed. The stored wheat, if paid for, would have become an asset out of which the note might in the future be paid, while nothing could be anticipated from the satisfaction of the overdraft. Again, had the money been devoted to the purposes intended, Hughes would not have been left

131Tenn10

empty-handed at the time of Reeve's death, in June
of that year, but would have had funds with which
to carry on his business, as was intended, and the
opportunity to acquire means from which to satisfy
the note. These securities had the undoubted right
to stipulate for the application of the proceeds of
the note to the purposes intended. The representa-
tions of Hughes, with their response by signing in
reliance thereon, amounted to such an agreement. As
Reeve had full knowledge of all this, he took the note
thus limited, and, by diverting a part of the proceeds
to another purpose—i. e., the payment of the over-
draft, without their consent—released them from lia-
bility.''

In accord is *Haworth* v. *Crosby,* 120 Iowa, 612, 94
N. W., 1098.

Other cases sustaining the doctrine of those above
are *Altoona Bank* v. *Dunn,* 151 Pa., 228, 25 Atl., 80,
31 Am. St. Rep., 742; *Petefish* v. *Watkins,* 124 Ill.,
384, 16 N. E., 248; *Chaffe* v. *Taliaferro,* 58 Miss.,
544; *Lee* v. *Bank,* 2 Sandf. Ch. (N. Y.), 311.

The case of *Hefferlin* v. *Krieger,* 19 Mont., 123, 47
Pac., 638, has sometimes been improperly cited as
holding that such a distinction is to be made between
the diversion of an instrument and the diversion of its
proceeds. That case, as we conceive, went off on a
ruling that the surety had not been injured, and had,
further and particularly, failed to show that his prin-
cipal had not purchased the property in aid of the

acquisition of which the note had been executed by the surety.

The diversion of portions of the net fund produced by the $7,500 note, in the payment of the existing obligations of the old company to the bank, in reality defeated the purpose for which Howard became surety on the note. The misuse of the net fund of $6,000 is more clearly marked in the present case than in any case we have examined on the immediate subject-matter. Here the application of the fund was not, as is the usual case, on a mere noncontemplated indebtedness of the surety's principal, the new company, but was on the indebtedness of another corporation, the old company—a use *ultra vires* the corporate principal of the surety, so far as this record indicates. To permit the bank to thus benefit in receiving satisfaction of these old company obligations, and also to look to Howard's executor, would be unconscionable.

It is urged that some of these old obligations were not charged off by the bank; that the payments were, instances, made by McLemore, as president of the new company, in drawing checks against its bank account into which the net proceeds of the $7,500 note went, thus, it is urged, absolving the bank from affirmative participation. The law does not regard as essential the mere method by which a fund is diverted. The main element of responsibility therefor is that of knowledge on the part of the bank that there was a misuse for its advantage; that it willingly and of

purpose took the benefit of a fund on deposit with it which it knew the surety had directed into a channel that would serve his friend in causing a continuance for the benefit of all of his business in the form of the new company. The surety's only chance of indemnification lay in the leaway granted the new company in the capital loan and the period of time allowed for payments back from the product or increment of that loan. When the bank to serve a present advantage resorted to that fund for the satisfaction of paper of the insolvent grain company, it lost its hold on Howard as surety on that note.

However, since we find that Howard assented to the payment of the $1,500 obligation of the old company, on which he was surety, there was not a misapplication as to him in so far; and the $7,500 note is enforceable to that extent.

The chancellor, in failing to so rule, erred. His decree will be modified in these respects and affirmed.