51 P.(2d) 857

PACIFIC NAT. AGR. CREDIT CORPORATION v. HAGERMAN.

No. 4024.

Supreme Court of New Mexico.

Nov. 15, 1935.

Reid & Iden, of Albuquerque, for appellant.

Hurd & Crile, of Roswell, for appellee.

SADLER, Chief Justice.

H. J. Hagerman appealed from a judgment in favor of Pacific National Agricultural Credit Corporation, the appellee, against himself as indorser of a certain note for $62,000. The judgment was rendered by the district court of Chaves county in a suit against Southspring Ranch & Cattle Company, maker of the note. It does not complain of the judgment against it. Since this appeal was taken, H. J. Hagerman has died, and Lowry Hagerman, as his administrator with the will annexed, has been substituted as appellant. However, in all subsequent uses of the word "appellant," the decedent, H. J. Hagerman, is meant.

The Southspring Ranch & Cattle Company, hereinafter referred to as "the ranching company," at the time engaged extensively in the sheep business, in 1927 procured a loan of $70,000 from appellee. On November 1, 1931, the balance due on the note evidencing the indebtedness, which was secured by a chattel mortgage on all the sheep and equipment of the ranching company, was the sum of $50,000. The loan was increased at this time by the

sum of $12,000. A new note in the sum of $62,000, dated November 1, 1931, was executed by the ranching company. This note was likewise secured by chattel mortgage on all the property described in the initial mortgage, and in addition a second mortgage on certain real estate and bore the indorsement of H. J. Hagerman and Percy Hagerman, president and vice president, respectively, of the ranching company and holders of 80 per cent. of its capital stock. H. J. Hagerman, himself, actually owned slightly more than one-third of such stock. There was also assigned to appellee as further security a lease from Lowry Hagerman to the ranching company covering certain lands used for grazing of the sheep. Lowry Hagerman was the son of Percy Hagerman and the secretary and a stockholder in the ranching company.

The increased loan was granted pursuant to a written agreement between appellee and the ranching company, one of the conditions of which was that the $12,000 should be used only for "expenses incident to running the livestock." Seventy-five hundred dollars of the advance was to be made immediately available owing to the requirements of the herds, and the balance after receipt of a pre-sharing advance on the 1932 wool crop then under contract.

Without the knowledge or consent of the indorser, H. J. Hagerman, the appellee, contrary to its agreement, diverted $1,913.-90 of the promised advancement by paying to itself accrued interest in that amount on the old loan. At the time, the sheep were running in the high, cold country between Encino and Lamy; the winter was unusually severe, the ground being covered with snow and ice, and so remaining throughout the season. Many sheep died, and a material loss resulted by reason of the unavailability of the amount of the deducted interest item for feed; the value of the pledged property being appreciably decreased and appellant's liability correspondingly increased as a result thereof.

The appellant, although its president, was not in active charge of the ranching company and knew only in a general way of its operations. However, before indorsing said note he talked over with his brother, Percy Hagerman, managing officer of the company, the status of the corporation, and matters connected with said loan. He also had before him a copy of the loan agreement and relied upon its terms in indorsing the note. He was moved to indorse the note in order to secure a renewal of the old indebtedness and procure for his company the additional sum of $12,-000 in the hope that conditions would improve and the ranching company thus be enabled to pay its debts.

The appellant did not understand there would be any deductions from the $7,-500 which was to be rendered immediately available upon compliance with the terms of the loan agreement. He would not have indorsed had he known all the money promised to be rendered immediately available would not be made so promptly upon

execution of the loan agreement and compliance with its terms.

Appellant did not learn of this interest deduction by appellee until the month of February following. He made no protest on account thereof and acquiesced in the ranching company continuing to draw upon the amount of the agreed advancement and to expend it for the benefit of the corporation of which he was president and owner of one-third of its capital stock. However, his acquiescence, if it properly may be so designated, was merely passive. He did no affirmative act of acquiescence or approval relative to the improper diversion of the amount mentioned to payment to itself of this pre-existing debt of the ranching company.

The indorsement of said note by Percy Hagerman and the appellant, H. J. Hagerman, induced appellee's agreement to make the additional advance of $12,000. Without such indorsements the additional advance would not have been made.

After the advance in question had been arranged for but before any of the proceeds thereof had been made available to the ranching company, the appellant verbally guaranteed payment to Gross-Kelly & Co., of the cost of a carload of cottonseed cake approximating $500 furnished to, and used by, the ranching company in the care of its sheep. The purchase price of this item was paid to Gross-Kelly & Co., from proceeds of the additional advances made to the ranching company by appellee pursuant to said loan agreement. The appellant had knowledge of such payment and by virtue thereof was relieved of any claim of liability under his guaranty of payment for the carload of cottonseed cake as aforesaid.

From the foregoing facts, all of which are within the findings of the trial court, it was concluded that whatever information appellant acquired as president and director of the ranching company concerning its affairs he also knew in his individual capacity; that he had actual and constructive notice of the interest deduction by appellee, such actual notice being acquired in February, 1932; that there was a misapplication by appellee to appellant's damage of the interest item of $1,913.90 which it paid to itself from the proceeds of said advance; and that in thus diverting the amount of such payment appellee breached the agreement under which appellant had indorsed said note but that afterwards the appellant, with full knowledge of the facts, ratified said deduction. Finally, it was concluded that the appellant was liable on his indorsement and the judgment from which this appeal is prosecuted was entered accordingly.

On the part of appellant we have presented a claim of discharge from liability by reason of the improper diversion by appellee of a portion of the loan promised to repayment to itself of a pre-existing debt due it from the indorser's principal. Appellee, availing itself of section 2 of rule 15, Rules of Appellate Procedure, complains as error committed against it.

of the trial court's finding that there was ever any agreement on appellee's part to forego or postpone payment from the advance of the accrued interest due it; the contention being there is no substantial evidence to support the finding.

Of course, the appellant's defense at its threshold rests on the premise that an unauthorized diversion was made of a portion of the proceeds of the advance promised. It then first becomes important to dispose of this claim of error against it urged upon us by appellee. If sustained, there obviously is no occasion to listen to appellant. On this point, however, we need say no more than that our consideration of the record quite satisfies us that the finding assailed has adequate support in the evidence. The evidence on the issue conflicted, the trial court resolved the conflict in appellant's favor, so the finding is before us and must be accorded such legal consequence as its bearing on the case merits.

Taking up appellant's contention, we think we may fairly assume it as conceded by appellee that the unauthorized diversion of this sum of approximately $2,000 in the repayment to itself of an antecedent debt, operating to the damage of appellant as the trial court found, results in appellant's discharge from liability as an indorser unless, as the trial court also found, the appellant, with full knowledge of the facts, ratified and approved the same. We need cite no authority to the proposition that any unauthorized change in the contract between the creditor and the debtor, particularly where such change operates to enlarge or increase the liability of a surety or indorser for the latter, operates to release such surety or indorser from liability.

We turn then to a consideration of the circumstances relied upon by appellee as support for the finding of ratification. The appellant challenges such finding as being without support. Whether it is presents the decisive question.

The parties devote considerable time in their briefs to the question whether knowledge acquired by the ranching corporation was imputed to appellant by virtue of his offices as president and director of such corporation. Of course, the particular knowledge whose imputation is sought is that of the unauthorized diversion of funds to interest payment. But actual knowledge of the deduction is brought home to appellant in February, 1932. As we view the record, in the light of the trial court's finding that appellant never did any affirmative act in ratification or approval of the deduction, we are unable to see how imputed knowledge of same at an earlier date would affect the matter.

Our interest in appellant's relationship to his corporation, both by reason of substantial stock ownership and official position as president and director, was intrigued to the point of inquiring whether the facts disclosed the corporation as an alter ego of his in whose name he conducted his own business, so as in reality to constitute

him a principal debtor rather than an indorser. But the record does not present such a case and such was not the theory of his liability in the trial court. He was held liable as indorser only—a secondary liability.

One of the main arguments urged upon us by appellee's able counsel is that by remaining silent and passive after learning of the deduction, with knowledge that the creditor was continuing its advances on the faith of his indorsement, and by failing to notify it that he claimed a discharge and would refuse to be bound, the appellant acquiesced in the deduction, and cannot now be heard to question it.

But was it appellant's duty to speak? If not, then he may still be heard to complain of this breach of the condition under which he became an indorser.

Mr. Brandt, in his work on Suretyship and Guaranty (3d Ed.) § 379, says: "If the surety knows of the extension at the time it is given it is not necessary that he should object thereto, in order to entitle him to his discharge. *It is not enough to bind him that he is informed and is passive. He is not required to object or protest.* He must actively concur and consent to be bound by the terms of the new agreement." (Italics ours.)

The author of the text on Principal and Surety in Corpus Juris states the rule at 50 C.J. 113, 114, § 192, as follows: "Consent may be implied from the conduct of the surety, such as advice or a request to perform the acts relied on as a discharge, or from a course of business or usage known to the surety. Where consent is to be implied, the facts from which it is to be implied must very clearly warrant the implication. *Mere knowledge of acts done by the creditor or obligee subsequent to the making of the contract of suretyship without objection on the part of the surety is not consent by the latter, for, as a general rule, some affirmative action is necessary."* (Italics ours).

In City of Middletown v. Ætna Indemnity Co., 97 App.Div. 344, 90 N.Y.S. 16, 17, a surety on a contractor's bond was sought to be held. The record as it then appeared showed construction of a tunnel upon a course other than as called for by the original contract whose performance the surety had guaranteed. The court said:

"It cannot be doubted that, as a general proposition, a surety is absolutely released from liability where a contract guaranteed by the surety is changed by the parties without his consent. We are of opinion that there is in the record no evidence to show that the appellant ever assented to the change of route from that around the hill to the straightened line through it. There is no evidence at all that the surety company ever knew of such a change being made until something over 1,000 feet of the tunnel, according to the new route, had been completed, and then, even though one of its officers may have learned of the change, nothing that he said or did can be construed into an assent to the new arrangement, or a ratification thereof. *No*

*duty devolved upon the appellant to speak when it learned of the deviation that had been made from the contract which it had guarantied. Its release had already been effectuated, and no authority is presented to us to show that, after the release was complete, it devolved upon the appellant to comment either one way or the other upon the situation.* It had a perfect right to rely upon the acts of the parties as it found them, and to take advantage without comment of the release it had received from the city by virtue of the abandonment of the contract for which it had been surety for a contract to lay a tunnel through a different course." (Italics ours.)

"It is undoubtedly true, we think, that, if an extension of time is granted the principal, the surety is discharged unless he consents thereto. Mere knowledge of such extension, without more, is immaterial." Lambert v. Shetler, 71 Iowa, 463, 32 N.W. 424.

"*It is not necessary to the discharge of a surety* on account of indulgence given by the creditor to the principal, *that the surety should show notice to the creditor of his dissent to the indulgence. The act of the creditor discharges the surety, without any act of dissent on the part of the surety.* The surety stands upon his legal rights, and the creditor must look to his own acts, and their legal consequences. The Court therefore did not err in refusing to charge that such notice was necessary." Executors of Riggins v. Brown, 12 Ga. 271.

And to same effect that mere silence or passive conduct after knowledge of breach of the condition under which the surety signed does not constitute acquiescence or consent, see the cases of Thompson v. Metropolitan Bldg. Co., 95 Wash. 546, 164 P. 222; A. B. Klise Lumber Co. v. Enkema, 148 Minn. 5, 181 N.W. 201; Union Indemnity Co. v. Benton County Lumber Co., 179 Ark. 752, 18 S.W.(2d) 327, 330; American Iron & Steel Mfg. Co. v. Beall, 101 Md. 423, 61 A. 629, 4 Ann. Cas. 883.

In Union Indemnity Co. v. Benton County Lumber Co., supra, the Supreme Court of Arkansas said: "In this case the principals have made a settlement by which the debt for which the surety was liable was extinguished and another and different obligation created to suit their convenience, and the surety, appellant not having consented thereto, was discharged. [Citing.] And consent will not be implied by mere knowledge of, and acquiescence in, the terms of the settlement, but there must be some affirmative action by the party to be bound. [Citing.]"

The cases are many declaring the surety entitled to a discharge, where the creditor knows the surety has signed with an understanding that proceeds of the loan will be devoted to a particular purpose and the creditor diverts a portion of such proceeds to another purpose. See the following authorities in several of which the unauthorized diversion was to the payment of an antecedent debt due the creditor: 21

R.C.L. 1010, § 59, "Principal and Surety"; Hermitage National Bank v. Carpenter, 131 Tenn. 136, 174 S.W. 263, Ann.Cas. 1916D, 730; Goodwin v. Abilene State Bank (Tex. Civ.App.) 294 S.W. 883; Gano v. Farmers' Bank, 103 Ky. 508, 45 S.W. 519, 82 Am.St. Rep. 596; Planters' State Bank v. Schlamp, 124 Ky. 295, 99 S.W. 216; Crossley v. Stanley, 112 Iowa, 24, 83 N.W. 806, 84 Am.St.Rep. 321; Haworth v. Crosby, 120 Iowa, 612, 94 N.W. 1098.

■ Since, as we have shown, acquiescence or consent may not be predicated upon appellant's mere silence or passivity, without more, upon what other circumstances shown by the record may the finding of ratification and acquiescence rest? We find nothing in the record supporting a conclusion that appellant ever consented to or acquiesced in the improper diversion mentioned. Silence, after knowledge, is shown, to be sure, but silence alone is not enough. Nor do we find any acts or conduct on the part of appellant calculated to mislead appellee into believing, to its prejudice, that appellant had consented, and thus become the basis of an estoppel.

The appellee did not notify appellant, the indorser, that it proposed to pay itself an antecedent debt from the advance promised nor notify him that it had done so. He learned of the deduction from his brother upon his return from Washington, D. C., after an absence of some weeks, in February, 1932. Appellee's failure to ask appellant's consent to the diversion or to notify him of it is quite understandable. It claimed its action in the matter

was as agreed between the parties and even complains here of the trial court's finding otherwise. We have held that we cannot disturb this finding.

But it is argued: The fact that the ranching company paid from the proceeds of the advance the purchase price of a carload of cottonseed cake, approximating $500, for payment of which appellant stood guaranty; the circumstance that he was indorsing for a corporation of whose stock he owned one-third and that appellee had required additional security in the form of a grazing lease on a large body of land to be procured by the ranching company and assigned to it, thus minimizing his possible loss as indorser—that these considerations show such benefit to appellant as to estop him from denying liability.

This line of argument is no doubt what drew the trial court into error. It apparently made benefit to appellant the test of his liability as indorser, preventing him by an estoppel from questioning liability on a contract he was induced to sign through hoped for benefits as a stockholder in the ranching company whose paper he had indorsed. In other words, he was not purely an accommodation indorser; he believed he was serving his own interests and is not entitled to the same liberality of treatment which the law accords volunteer sureties. Cf. First National Bank v. Livermore, 90 Kan. 395, 133 P. 734, 47 L.R.A. (N.S.) 274.

But it requires no application of the rule of strictissimi juris usually accorded a

volunteer surety to sustain appellant's claim of nonliability. If he had signed as a paid surety, rather than in the expectation of incidental and indirect benefits as a stockholder, any unauthorized change in the contract, resulting in damage to him, would give him his discharge. Benefit, as we have shown, is not the test of a surety's liability. The paid surety exacts a benefit usually in the form of a premium. And yet the books abound with cases giving the paid surety his discharge for some alteration of the contract made without his knowledge or consent and to his injury.

The question of appellant's liability is really a mixed one of ratification and estoppel. Has he, since learning of appellee's improper diversion of a portion of the funds promised appellant's principal, done any act intended or calculated to mislead, and which has misled, appellee to its prejudice? If so, such act will amount to a ratification of appellee's conduct and estop appellant from relying upon it for a discharge. The language of the Supreme Court of Arkansas in the late case of Union Indemnity Co. v. Benton County Lumber Co., supra, is pertinent to the principle discussed. It said: "It is doubtful whether appellee had any knowledge of the terms of the settlement; but if it did, there is a total failure to show any active participation by it in the negotiations, or any act upon the part of its agent by which the lumber company was misled or induced to abandon a valuable right, or do any other act by which it could be or was estopped to set off its rights in some future proceeding, for an estoppel can only be predicated on some act or declaration intended to mislead another, who has relied thereon and acted or refrained from acting to his injury. [Citing.]"

Does the fact that appellant remained silent after learning of the diversion deny him his defense on account thereof? We have demonstrated that it does not. And under the facts here shown, neither the anticipated incidental benefit to flow to him as a stockholder from the renewal and advance nor the procural by the ranching company and assignment to appellee of the grazing lease has any material bearing on the question before us. Furthermore, both considerations precede the unauthorized diversion.

The only other circumstance relied upon for the ratification claimed is payment by the ranching company from proceeds of the advance for the carload of cottonseed cake purchased on appellant's guaranty. The record is not clear whether this item was paid before or after actual knowledge by appellant of the interest deduction by appellee. Certain it is that appellant had given his verbal guaranty before any of the money promised was advanced or the unauthorized deduction made. What transpired thereafter (and whether before or after knowledge or notice to appellant of the deduction does not appear) was payment by the ranching company for the carload of cake. Payment was not his act though it relieved him of any claim of liability as a guarantor. It is not shown that

either he or appellee knew exactly when payment was made.

It is not suggested how he might have prevented the ranching company from discharging its primary liability for the cottonseed cake. We are unable to see how this circumstance can serve to support the claim either of ratification or estoppel. Appellee does not point out how it did or might have influenced action on its part to its prejudice.

. We desire, before closing this opinion, to take notice of the principal authority cited by appellee upon a question already adverted to, viz., imputation to appellant of knowledge of the improper diversion of funds by virtue of his office as president and director. The case relied upon is McCarty v. Kepreta, 24 N.D. 395, 139 N.W. 992, 48 L.R.A.(N.S.) 65 (case note), Ann. Cas.1915A, 834 (case note). Actual knowledge of the diversion having been brought home to appellant some two months after it occurred, we still are unable to see how imputed knowledge at an earlier date would either aid appellee's position or weaken that of appellant.

Nor, if the matter were material, is it at all certain that the case relied upon furnishes safe support unless confined to cases of the kind there considered involving the rights of an executive or managing bank officer as purchaser of commercial paper from his bank, or other instances where corporate property is the subject-matter of direct dealing between an officer and his corporation, and to permit him to deny knowledge would operate as a fraud on some third person. The decision seems to have been governed by principles quite different—viz., a corporate official's duty as a fiduciary to keep himself informed as to the corporate business—from the rules ordinarily controlling upon the question of imputed knowledge.

Concerning the North Dakota case mentioned, Mr. Fletcher, in his Cyclopedia on Corporations (volume 4, § 2258, p. 3505), says: "While it seems to have been held in North Dakota that knowledge of one officer of a corporation which is imputed to the corporation is also to be imputed to one of the directors who was the president so as to affect him as an individual, the better rule seems to be that the knowledge of a corporation derived by virtue of the relationship between itself and an officer or agent thereof is not imputed to another officer or agent as an individual." And in the notes (page 3506) he comments: "In a note in 48 L.R.A.(N.S.) 65, it is stated that this case, so far as a sale of bank paper to its president is concerned, 'may be regarded as the pioneer case upon that question.' See also note in Ann.Cas. 1915A, 855: It is necessary to keep in mind that the question as to what a director is bound to know, from his office, in regard to the corporate property or business, in purchasing property from the corporation, is governed by entirely different principles, i. e., his duties as a fiduciary to keep himself informed as to the corporate business."

The author of the case note at 48 L.R.A. (N.S.) 65 speaks of McCarty v. Kepreta,

supra, as a "pioneer case" upon the subject under discussion, and seems to justify it upon the ground that "the duties of a bank president in respect to commercial paper handled by the bank demand a higher degree of care than do those of officers of other classes of corporations." In other words, as indicated hereinabove, the duties and disabilities of the director as a fiduciary seem to the author of the case note to have been controlling. Cf. H. B. Cartwright & Bro. v. United States Bank & Trust Co., 23 N.M. 82, 167 P. 436.

In concluding his annotation of the North Dakota case, the author of the case note in Ann.Cas. 1915A, 855 says: "In conclusion of this branch of the discussion it may be said that while the reported case finds some support for its holding that an officer of a corporation dealing with it at arm's length is, so far as third persons are concerned, bound to know of a defect in the subject of the purchase, yet from the general tendency of the decisions there exists reason for doubting whether the courts generally would carry the doctrine to such an extreme length."

Other decisions which, under the facts present, seem to rely upon or cite approvingly McCarty v. Kepreta, supra, are Enterprise .Foundry & Machine Works v. Miners' Elkhorn Coal Co., 241 Ky. 779, 45 S.W.(2d) 470; Knox-Harrison Bank & Trust Co. v. Johnson, 89 Ind.App. 318, 164 N.E. 298; Grosfield v. First Nat. Bank of Miles City, 73 Mont. 219, 236 P. 250; Hughett v. Shain, 253 Ky. 330, 69 S.W.(2d) 688.

Authorities enunciating a doctrine opposed to that put forth in McCarty v. Kepreta, some without even citing it, and others ·citing it but to draw a distinction. are Washburn v. Inter-Mountain Mining Co., 56 Or. 578, 109 P. 382, Ann.Cas.1912C, 357; Dodo v. Stocker, 74 Colo. 95, 219 P. 222; Commercial Sav. Bank v. Kietges, 206 Iowa, 90, 219 N.W. 44; Pitman v. Walker, 187 Cal. 667, 203 P. 739; Minnesota Loan & Trust Co. v. Peteler Car Co., 132 Minn. 277, 156 N.W. 255; First Nat. Bank v. Carroll, 46 N.D. 62, 179 N.W. 664.

Our discussion of the leading case relied upon by appellee on the question of imputed knowledge in its application to the facts of this case is not to be taken as reflecting a view the one way or the other upon the soundness of its doctrine applied to the facts considered. We simply point out that its soundness for application to corporate officers generally, without regard to nature of the corporation or character of the transaction, has been seriously questioned several times both by legal text and adjudicated cases.

As emphasizing the rule that the indorser of corporate paper does not lose his rights and status as such by the mere circumstance that he happens to be an officer and director, see Keiser v. Butte Creek Consol. Dredging Co., 48 Cal.App. 38, 191 P. 552; Phipps v. Harding (C.C.A. 7th Cir.) 70 F. 468, 478, 30 L.R.A. 513; First State Bank v. Rock Creek Producers' Oil Co., 34 Wyo. 405, 244 P. 372; Haynes Automobile Co. v. Shepherd, 220 Mich. 231, 189 N.W. 841, 25 A.L.R. 960; Bovay v,

Fuller (C.C.A.8th Cir.) 63 F.(2d) 280; Sinkey v. Steffens, 126 Ohio St. 66, 183 N.E. 866.

The first paragraph of the syllabus to the case of Keiser v. Butte Creek Consol. Dredging Co., supra, reads: "The fact that defendants, indorsers of corporation's notes, were also directors or officers with full knowledge of the corporate affairs and of the failure to pay the note does not excuse lack of notice of presentment and dishonor."

In Phipps v. Harding, supra, the indorsers were directors of the corporation and constituted a majority of the board of directors of the maker. Circuit Judge Jenkins, writing for the court, said: "Their contract is personal and individual, and is not affected by their official relation to the company." We need not accept that statement in all its implications to see its pertinency to the situation of the parties in the case at bar. Nor, after careful consideration, do we find anything in the record denying appellant's claim to the protection of an endorser or surety.

What then is the effect of appellee's variance of the contract of suretyship? Does it release appellant only pro tanto, or does it operate as a complete discharge? We have held the latter to be its effect. Morgan v. Salmon, 18 N.M. 72, 135 P. 553, L.R.A. 1915B, 407.

It follows that the judgment appealed from must be reversed. The cause will be remanded, with a direction to the trial court to set aside its judgment in so far as the same awards recovery against appellant and to enter judgment in his administrator's favor on the issues framed and for his costs.

It is so ordered.

HUDSPETH, BICKLEY, and ZINN, JJ., concur.

BRICE, J., did not participate.