879 P.2d 78

**FEDERAL DEPOSIT INSURANCE COR-PORATION, in its corporate capacity, as Liquidator of New Mexico National Bank, a national banking association, Plaintiff–Appellee,**

v.

**Richard MOORE and Paulette Moore, Defendants–Appellants.**

No. 20903.

Supreme Court of New Mexico.

July 7, 1994.

David L. Norvell and Thomas A. Tabet, Albuquerque, for appellants.

Gary Don Reagan, P.A., Gary Don Reagan, Mark Terrence Sanchez, Hobbs, and Ann S. DuRoss, Richard J. Osterman, Jr., and E. Whitney Drake, Washington, DC, for appellee.

## OPINION

FRANCHINI, Justice.

Richard and Paulette Moore appeal from a grant of summary judgment against them and in favor of the FDIC. The Moores guaranteed a loan made by New Mexico National Bank to High Country Ceramics, Inc. ("the Corporation"). The FDIC is the liquidator of the Bank, which became insolvent in July, 1986. Because it is undisputed that the Moores revoked the guaranty and that the Bank then materially altered the terms of the note in contravention of the Moores' instructions, we conclude that the Moores must be discharged from their liability as guarantors. Accordingly, we reverse the judgment.

*Facts and proceedings below.* On May 29, 1984, Richard Moore as vice-president and Darrel E. Brigham as president of the Corporation procured a short-term loan from the Bank, submitting a security agreement and financing statement for accounts receivable and inventory. On the same day, both officers and their wives executed continuing guaranty agreements to further secure any loan from the Bank to the Corporation. The guaranty, which was for an unlimited amount, applied to extensions and provided that the Bank had no duty to give notice to the guarantors of any modifications of the terms of the loans.

In June, Brigham and Moore, on behalf of the corporation, assigned to the Bank the invoice receivables from the Corporation and the Bank extended the maturity date on the loan. On October 3, 1984, the Corporation obtained a loan of over $92,000 from the Bank and the Brighams additionally secured the loan with a mortgage of their real property. The Brighams later obtained two extensions of the maturity date of October 15, 1985 so that the note was to mature on April 3, 1986.

Moore discovered that only interest payments were being made on the note and on March 17, 1986, notified the Bank in writing that Brigham was improperly liquidating assets that secured the note without applying the proceeds to the note. On April 11, Moore notified the Bank in writing that he would no longer serve as guarantor for future loans or extensions obtained by Brigham or the Corporation and insisted that the outstanding past-due note on which he was subject to liability as guarantor be called as due and owing. Moore stated in the letter that he believed the corporate assets were presently sufficient to cover the indebtedness, but that he was concerned that if the Bank did not call the note, those assets would not be available. The Bank apparently ignored Moore's letter and on May 29, 1986, upon Brigham's request, again extended the past-due note to mature December 15, 1986.

The Bank was declared insolvent on July 17, 1986, and the FDIC purchased the Bank's assets, including the note. The Corporation defaulted on the note and the FDIC brought suit for foreclosure and money due against the Corporation, the Moores, and the Brighams for the corporate debt. The FDIC also sued the Brighams for foreclosure and money due under a separate note for a personal loan the Brighams obtained in 1985 and secured with another mortgage on the same real property in the same suit.

*Issues and arguments.* The FDIC moved for summary judgment on the basis of the notes, guaranty contracts, and extensions. The Moores responded, claiming that there was a genuine issue of material fact whether they signed the guaranty contract in their personal or corporate capacities. They attached affidavits swearing they signed the guaranty contract on behalf of the corporation and not in their personal capacities and showed that the acknowledgment of their signatures used the corporate acknowledgment form, stating that they were "of High Country Ceramics, Inc."

The Moores further contended that as a matter of law, they should be discharged from the obligation under the note because

the Bank extended the note after it received notice that the Moores would not guarantee payment if further extensions were granted. They cited as authority *Sunwest Bank of Farmington v. Kennedy,* 109 N.M. 400, 402, 785 P.2d 740, 742 (1990) (stating that a surety may be discharged when the holder grants an extension of a note without authorization of the surety), and *Western Bank v. Aqua Leisure, Ltd.,* 105 N.M. 756, 757, 737 P.2d 537, 538 (1987) (stating that "[a] guarantor is discharged from his obligation if there is a material change in the obligation unless the guarantor consents to the change").

The FDIC argued that as a matter of law, the Moores had to have signed in their personal capacities because "the only [legal] purpose for signing a guaranty is for an individual to guarantee the corporate debt." It asserted that the guaranty itself allowed extensions without the Moores' consent and that the Moores were bound by the guaranty contract. The FDIC also contended that because the Moores could not revoke their guaranty insofar as it related to the pre-existing indebtedness of the corporation, *see First Nat'l Bank v. Energy Equities Inc.,* 91 N.M. 11, 15–16, 569 P.2d 421, 425–26 (Ct. App.1977), they must be held liable under the guaranty contract for extensions made after notice was given. The FDIC complains that it would be unfair to make a bank face a "dire alternative of either calling the corporate loan [at the time it became due] or . . . losing the benefit of the guaranty."

■■■ *The court properly determined as a matter of law that the Moores signed the contract in their personal capacities.* The Moores' signatures on the guaranty contract were not accompanied by words to the effect that they signed as officers on behalf of the corporation. Only the acknowledgment form states that the individuals are "of High County Ceramics, Inc." This statement alone, in light of the fact that there would be no purpose in a corporation guaranteeing its own debt, is not sufficient to raise a genuine issue of material fact of capacity. A contract signed personally by an individual with no qualifying language following the signature results in personal liability on the contract. *Bank of New Mexico v. Priestley,* 95 N.M. 569, 573, 624 P.2d 511, 515 (1981). We hold that, as a matter of law, the Moores signed the guaranty in their personal capacities.

■■■ *A continuing guaranty does not cover unauthorized post-revocation extensions of obligations existing at the time of the revocation.* Under the FDIC's interpretation of guaranty contracts, one who signs a continuing guaranty may never revoke its contract as to an existing obligation and is indefinitely left at the mercy of the bank and the principal obligor. We find this interpretation to be incompatible with surety law. It is black letter law that an offer to guarantee future obligations in a continuing guaranty may be revoked absent a contrary provision in the guaranty instrument. *See* Annotation, *Duration of Continuing Guaranty,* 81 A.L.R. 790, 795–98 (1932); Arthur A. Stearns & James L. Elder, *The Law of Suretyship* § 4.20, at 87 (5th ed. 1951). There is a split in case law as to whether a guarantor is released from liability if, after revocation of a continuing guaranty, a bank makes further extensions or renewals without the consent of the guarantor. *See* Annotation, *Guaranty as Covering Renewals, after Revocation, of Claims Within Coverage at Time of Revocation,* 100 A.L.R. 1236, 1237–39 (1936); *compare Southern California First Nat'l Bank v. Olsen,* 41 Cal.App.3d 234, 116 Cal.Rptr. 4, 8–9 (Ct.App.1974) (holding that "continuing guaranty does not cover renewals, after revocation, of obligations which were covered by the guaranty at the time of revocation."); *Gandy v. Park Nat'l Bank,* 200 Colo. 298, 615 P.2d 20, 22 (1980) (en banc) (same); *Bank of U.S. v. Andron,* 155 Misc. 21, 277 N.Y.S. 594, 598 (Mun.Ct.1934) (same); and *Straus–Frank Co. v. Hughes,* 138 Tex. 50, 156 S.W.2d 519, 521 (1941) (same), *with Corn Exchange Bank Trust Co. v. Gifford,* 268 N.Y. 153, 197 N.E. 178, 179–80 (1935) (holding guarantor responsible for renewals made after revocation.); *Broward Bank v. Southeastern X–Ray Corp.,* 463 So.2d 440, 442–43 (Fla.Dist.Ct.App.1985) (same); and *Marking Sys. Inc. v. Interwest Film Corp.,* 567 P.2d 176, 178–79 (Utah 1977) (same). In a case factually similar to the one at bar, the Indiana Court of Appeals in *Franklin Bank & Trust Co. v. Reed,* 496 N.E.2d 596 (Ind.Ct.

App.1986), *aff'd in part & vacated in part on other grounds,* 508 N.E.2d 1256 (Ind.1987), explained the rationales of the two views as follows:

[The cases releasing the guarantor] proceed on the rationale that when a guarantor revokes the guaranty, his obligations to the creditor become fixed as of that date. The Bank, at the maturity of the existing loans if they are not paid, may proceed against the guarantor and collect the amount due. If the Bank accepts a renewal after the revocation it elects to be bound by the revocation, and it is presumed that it thereafter relied upon the credit of the principal and his security....

[The cases obligating the guarantor reasoned that the] language of the guaranty is very broad and provides that the creditor could extend the time of payment, renew the obligation, release collateral, and the like without further consent of the guarantor or even notice to him. The guaranty also provides that any revocation will not release the guarantor for obligations incurred prior to revocation.... Those cases construed the broad language of the guaranty to mean that the original debt remained even though the evidence of the debt, the note, was extended....

[This latter rationale] is fundamentally flawed. The language contained in the guaranty which gives the Bank the powers, without the consent of or notice to the guarantor, to extend the time of payment, renew the obligation, release collateral, or alter the obligation, also terminates them by the guarantor's revocation. Nothing in the guaranty makes these rights divisible from the right to extend further credit and have them continue even though the right to extend further credit is terminated. We perceive that the purpose of the insertion of the right of revocation into a guaranty is to permit a guarantor to monitor the activities of his principal and, for whatever reason he deems best, terminate the guaranty if he feels his liability has become excessive, or that he has become overly exposed. Thus, the clear sense and implication of the language of the continuing guaranty, including the right to terminate, is that the rights to renew, extend the time

of payment, release collateral, or alter the obligation must be exercised while the continuing guaranty is operative. Those conditions, as well as the right to extend further credit, or any other right to act in the future, cease upon revocation. The creditor may no longer rely upon those rights for future acts. The creditor's relationship with the guarantor becomes fixed or frozen, and at that point his relationship to the creditor becomes that of any creditor to his surety. When he renews the obligation, extends time of payment, releases collateral, or alters the agreement without notice or consent, the guarantor is released.

The creditor, upon revocation, has the means to totally control his own destiny for he may at the time of revocation, and after the debt becomes delinquent, make demand upon and collect the same from the guarantor. If he chooses to forgo that safe option and rely upon his debtor, then under the usual rules of suretyship the guarantor is released. The courts in the cases [obligating the guarantor] have extended the obligations under the continuing guaranty by implication. This we will not do.

*Id.* at 603–04. We agree with the view expressed by the *Reed* court that the better rationale is stated by those courts that release the guarantor, and this view comports with the law of guaranty previously established in this state. A guarantor is "a favorite of the law," *see Shirley v. Venaglia,* 86 N.M. 721, 724, 527 P.2d 316, 319 (1974) (quoting 24 Am.Jur. *Guaranty* § 71 (Supp.1967)), the contract is to be strictly construed, and the guarantor's liabilities are "not to be extended by implication beyond the express limits or terms of the instrument, or its plain intent." *Id.* As the court in *Hughes* stated, when a guarantor revokes his guaranty, he recalls or takes back "every power and authority which he had granted therein.... Any other construction would amount to a holding that he had the power to revoke in part only. We cannot read into the language employed by the parties such limitation or restriction upon the right of revocation." 156 S.W.2d at 521. We hold that a revocation of a continuing guaranty revokes all

powers granted within the original guaranty, and that an extension of time granted without consent of the guarantor after such revocation releases the guarantor from his obligation under the guaranty contract.

■ *The contract by its express terms released the Moores from indebtedness created after revocation.* Under the facts of this case, the Moores were released from liability by the unauthorized extension for yet another reason. The rights of a guarantor are governed by the written contract of guaranty. *American Bank of Commerce v. Covolo,* 88 N.M. 405, 408, 540 P.2d 1294, 1297 (1975). The contract in question provides that the "[g]uaranty shall not apply to *any indebtedness* created after actual receipt by the Bank of written notice of its revocation as to future transactions." (Emphasis added.) The contract defined "indebtedness" as *"any and all ... obligations and liabilities of Borrowers or any one or more of them, heretofore, now, or hereafter made,* incurred or created, whether voluntary or involuntary and *however arising...."* (Emphasis added.) Although the trial court made no specific findings regarding the effect of the revocation, it found the Moores to be personally liable for the corporate debt. In its brief to this Court, the FDIC urged affirmance because the "indebtedness here sued upon was clearly created well before March or April 1986, and no revocation of their guaranty, howsoever constructed or described, could negate the Moores' obligations as guarantors of the pre-existing debt...." The trial court also must have interpreted "indebtedness created after ... revocation" to apply only to a brand-new loan. Implicit within the judgment is a finding that the extension of the loan did not create indebtedness, so the revocation did not operate to release the Moores from liability even though the extension was made after the revocation. However, by its express terms, the term "indebtedness" specifically includes "any and all ... obligations and liabilities ... hereafter made ... however arising...." Thus, by the contract's express terms, a revocation operated to relieve the guarantors of not only liability created by new loans, but also of liability created by an extension of a note. *Cf. Gandy,* 615 P.2d at 22 (holding, in a case on point with the one at bar, that under the express terms of a contract defining "indebtedness" as including a debt "arising under successive transactions," any extension of the payment date creates an "indebtedness" after the bank receives notice of revocation, and thus releases the guarantor of his liability).

■ *The Moores presented uncontroverted evidence of revocation of the continuing guaranty and of material alteration of the note.* The FDIC did not controvert the facts, but only argued the law. Under both the express provisions of the contract and operation of the common law, the Moores could and did revoke their agreement to unconditionally guarantee future debts of the corporation and to allow the Bank "carte blanche" in its dealings with the obligor. They did not, however, by revocation escape liability for accrued debt. One who is obligated under a guaranty contract is discharged from liability if the holder of the guaranteed note materially changes that obligation without the guarantor's consent. *Aqua Leisure,* 105 N.M. at 757, 737 P.2d at 538. When the Bank granted an extension of the note after the Moores demanded that the Bank call the notes on the date due, it materially changed the obligation of the Moores in two respects: it increased the amount of interest to be paid under the life of the note, thus creating "new debt" and "indebtedness" as defined in the contract, and it risked the collateral given as security for the note. Before the Moores revoked the guaranty, the Bank had the contractual right both to extend the note and to allow collateral to be sold; after revocation, it did not. Once the guaranty was limited to the outstanding debt due and the terms of the existing note, the Bank, by extending the note without the Moores' consent, released the Moores as guarantors. *See Pacific Nat'l Agric. Credit Corp. v. Hagerman,* 39 N.M. 549, 553–55, 51 P.2d 857, 859–60 (1935) (stating that when an unauthorized change in the contract between the creditor and debtor "operates to enlarge or increase the liability of a surety or indorser for the [debtor], [it] operates to release such surety or indorser from liability" and quoting with approval cases that discharge a surety when the creditor grants an extension

of time to the principal without the surety's consent).

The Bank took the risk of default and chose its own destiny after it ignored the warnings and revocation of the guarantor. It had no obligation to extend the note. In his letter to the Bank Moore, in effect, was stating "The corporation has defaulted on the note and can't pay it. Sue me now, while I can satisfy my claim against the corporation by collecting the secured assets and foreclosing on the mortgage." *See* Restatement of Security § 132 cmt. b (stating that the surety is subrogated to the rights of a creditor if he satisfies the obligation). It is not a "dire alternative" to require the Bank to choose what it believes to be the wisest course of action to collect a past-due note. It was not the Moores' revocation that released them from liability on the accrued debt; it was the extension without consent that did so.

*Conclusion.* We reverse and remand to the trial court for entry of judgment in favor of the Moores. *See Martinez v. Logsdon,* 104 N.M. 479, 483, 723 P.2d 248, 252 (1986) (stating that when no material factual issues are in dispute, trial court may grant summary judgment in favor of non-moving party even though that party has not itself moved for summary judgment).

IT IS SO ORDERED.

BACA and FROST, JJ., concur.