**FRANKLIN BANK AND TRUST COMPANY, Defendant-Appellant,**

**v.**

**Ruth E. REED, Plaintiff-Appellee.**

**No. 1-1285A305.**

Court of Appeals of Indiana,
First District.

Aug. 19, 1986.

Rehearing Denied Oct. 21, 1986.

Stephen L. Huddleston, Franklin, for defendant-appellant.

Michael Thomasson, C. Richard Marshall, Columbus, for plaintiff-appellee.

NEAL, Judge.

## STATEMENT OF THE CASE

Defendant-appellant, Franklin Bank and Trust Company (Bank), appeals an adverse decision rendered in the Shelby Circuit Court in favor of plaintiff-appellee, Ruth E. Reed (Ruth), in a dispute over the priority of a judgment lien rendered in a dissolution of marriage action.

We affirm in part and reverse in part.

## STATEMENT OF THE FACTS

On August 6, 1979, the Bartholomew Circuit Court entered a decree of dissolution of marriage dissolving the marriage between Ruth and her husband, Owen H. Reed (Owen). By the terms of the decree, Owen, among other things, was awarded the equity in real estate located in Johnson County which had been purchased by Ruth and him under a conditional sales contract from Jarvis and Murial Alexander. Ruth was awarded certain enumerated properties, and in addition thereto, in order to equalize property distribution, the court awarded Ruth an alimony judgment in the sum of $170,000.00 payable as follows: $20,000.00 payable on or before September 15, 1979; and payments of $30,000.00 each, payable on January 1 in each of the years 1980, 1981, 1982, 1983 and 1984. The decree made no provision establishing the judgment as a lien on any property awarded Owen to secure the payment of the alimony judgment, nor did the decree specifically award him the Alexander property free of a lien.

Owen made the September 15, 1979, and the January 1, 1980, payments but defaulted on the January 1, 1981 payment. Ruth recorded a certified copy of the decree in Johnson County on February 23, 1981, and on March 18, 1981, commenced proceedings supplemental. On June 9, 1981, the Bartholomew Circuit Court issued an order to the Sheriff of Johnson County to seize and sell, among other things, the Alexander real estate to help raise the $30,000.00 and apply the proceeds to the defaulted payment. It does not appear that any levy was ever made on the property because before the levy could be imposed, Ruth agreed with Owen that she would withhold execution if he would catch up on the payments in three $10,000.00 installments. Owen paid $20,000.00 in 1981 but again defaulted.

Thereafter, on December 5, 1981, Owen made an assignment of the Alexander real estate to the Bank to be applied on his debts there. On February 19, 1982, Ruth caused the execution to be reinstated. In July 1982, Owen filed for bankruptcy.

## ISSUE

The main issue, raised in a number of ways, is whether Ruth's alimony judgment was a lien on the Alexander property, and if so, was it superior to the Bank's interest. A second issue concerns a continuing guaranty executed by Ruth for Owen's debts during marriage. Facts concerning this second issue will be recited under a separate heading.

## DISCUSSION AND DECISION

*Issue I: Judgment Lien.*

The Bank argues that a judgment lien cannot attach to Owen's equitable interest

in the Alexander property and even if it could, the lien would only be equal to one installment. The Bank further contends that if Ruth had a lien, she waived it. Finally, the Bank argues that the dissolution judgment did not become a lien on the Alexander real estate. We will discuss only the last issue, as it is dispositive.

Ruth argues that a judgment lien exists by virtue of the general judgment lien statute, IND.CODE 34-1-45-2, and therefore, she is entitled to priority over any interest obtained by the Bank as a result of the subsequent assignment of Owen's equitable interest in the Alexander property. The Bank argues that the marriage dissolution section, IND.CODE 31-1-11.5-15, governs this matter exclusively, and since the trial court failed to establish a lien, none exists.

IND.CODE 31-1-11.5-11 empowers the trial court to order one spouse to pay the other a sum of alimony "either in gross or in installments." IND.CODE 31-1-11.5-15 provides:

> "Security for payment.—Upon entering an order pursuant to section 11· or 12 [13-1-11.5-11 or 31-1-11.5-12] of this chapter, the court may provide for such security, bond or other guarantee that shall be satisfactory to the court to secure the obligation to make child support payments or to secure the division of property."

The general judgment lien statute, IND. CODE 34-1-45-2, is as follows:

> "Lien upon real estate—Limitation of lien.—All final judgments for the recovery of money or costs in the circuit court and other courts of record of general original jurisdiction sitting in the state of Indiana, whether state or federal, shall be a lien upon real estate and chattels real liable to execution in the county where, and only where, such judgment has been duly entered and indexed in the judgment docket as provided by law, from and after the time the same shall have been so entered and indexed, and until the expiration of ten [10] years from the rendition thereof, and no long-er, exclusive of the time during which the party may be restrained from proceeding thereon by any appeal or injunction or by the death of the defendant, or by agreement of the parties entered of record."

The question presented here is whether IND.CODE 31-1-11.5-15 is the exclusive vehicle by which a trial court, by affirmative action, can create a lien on real estate to secure an alimony judgment, or whether the general lien statute, IND.CODE 34-1-45-2, is also operative to create a judgment lien unless the court, by affirmative action, declares that the real estate should be awarded to the spouse free of a lien. Two cases in Indiana address the problem. *Bell v. Bingham* (1985), Ind.App., 484 N.E.2d 624; *Uhrick v. Uhrick* (1977), 173 Ind.App. 133, 362 N.E.2d 1163, *trans. denied. Uhrick* involved a divorce decree entered in 1969, prior to the Dissolution of Marriage Act of 1973, whereby the wife was awarded an alimony judgment in 122 installments. The trial court made no provision establishing the judgment as a lien on property awarded to the husband, nor did it declare such property free of a lien.

The statute at that time, IND.CODE 31-1-12-17, provided that the court, upon the division of the property, could award the payment of money from one spouse to the other "either in gross or in periodic payments." Relative to liens, the statute stated in pertinent part:

> "In determining the character of the payments of the alimony the court may require it to be paid in money, other property, or both, and may order the transfer of property as between the parties, whether real, personal or mixed and whether title at the time of trial is held by the parties jointly or by one of them individually. In determining the method of the payment of the alimony the court may require that it be paid in gross or in periodic payments, either equal or unequal, and if to be paid in periodic payments the court may further provide for their discontinuance or reduction upon the death or remarriage of the wife, and,

in his discretion, the court may further provide for such security, bond, or other guarantee as shall be satisfactory to the court for the purpose of securing the obligation to make such periodic payments. Said judgment shall be a lien upon the real estate and chattels real of the spouse liable therefor to the extent that it is payable immediately but shall not be such a lien to the extent that it is payable in the future unless and to the extent such decree so provides expressly...."

IND.CODE 31-1-12-17.

Under the prior statute the court had the same extremely broad discretion to provide security for the payment of the alimony, whether in gross or in installments, which would include the establishment of a lien, similar to the current statute. The only significant difference is that under the prior statute the judgment became a lien only to the amount immediately payable, but not the deferred payments, unless the court expressly provided therefor.

The wife in *Uhrick* commenced an action in 1975, at a time when no installments were delinquent, to establish her alimony judgment as a lien on her former spouse's property, contending that when IND.CODE 31-1-12-17 was repealed by IND.CODE 31-1-11.5-1 *et seq.*, the Marriage Dissolution Act, the general judgment lien statute gave her that right. In short, she argued that IND.CODE 34-1-45-2 gave her a lien on her ex-spouse's property in addition to any action taken by the court under IND. CODE 31-1-12-17. The *Uhrick* court noted that judgment liens were purely statutory. For a money judgment to become a lien, the court continued, it must be a final judgment for a certain sum of money that can be collected by execution. This judgment, the court added, was not due and collectable by execution so it did not create a lien under IND.CODE 34-1-45-2. The court specifically held that the judgment did not create a lien for future payments where the decree did not specifically provide, but only created a lien for delinquent payments. The court refused to comment on whether a lien would be created under the Marriage Dissolution Act.

It is clear that the *Uhrick* court, by its holding, refused to augment IND.CODE 31-1-12-17, the divorce section, with IND. CODE 34-1-45-2, the general judgment lien statute, to provide that a decree for alimony became a lien on the obligated spouse's property where the decree was silent as to security or a lien. The decision, however, drew a sharp dissent from Judge Staton, who contended that such a ruling made alimony judgments vulnerable. He argued that IND.CODE 31-1-11.5-15 altered that result and indicated a clear policy change. Alimony judgments, he concluded, should be treated like any other judgments.

*Bell, supra,* a case decided under the Marriage Dissolution Act, addressed the problem where property was awarded to a wife who was ordered to pay an alimony judgment in installments. The decree in *Bell* did not specifically establish a lien under IND.CODE 31-1-11.5-15, but it contained the language that the property would be turned over to the wife as her sole property and that the husband would have no further interest in the real estate. After the wife's death, the husband filed no claim against the wife's administered estate, but after the estate was closed, he attempted to impress the unpaid balance of the alimony judgment as a lien against the real estate of the wife.

After reciting the familiar rules of statutory construction and noting that a judgment lien was purely a creation of the statute, the court stated that as between the general judgment statute and the dissolution statute, the more particular dissolution statute must apply to the situation. The court stated its rationale:

"Absent a written agreement by the parties, a dissolution court *must* divide the parties' property in contemplation of a financial parting of the ways. *Johnson v. Johnson* (1984), Ind.App., 460 N.E.2d 978; *Henderson v. Henderson* (1980), Ind.App., 401 N.E.2d 73. To accomplish this task, the trial court has the power to

transfer real property between the parties. *Henderson, supra; Plese v. Plese* (1970) [,] 146 Ind.App. 545, 257 N.E.2d 318. Inherent in the trial court's power to dispose of divorcing parties' property, is the power to award real estate free of liens or encumbrances so as to enable one spouse to pass title clear of any claim from the other spouse that would arise as a result of the divorce. IC 31–1–11.5–15 permits the disolution court to complete the task of disposing of marriage property in a just and reasonable manner. It gives divorce courts the authority to fashion security for the payment of property settlement awards independent of the judgment lien statute by creating a lien on a given tract of real estate or by freeing a particular tract of real estate from a judgment lien.

Here, the dissolution court awarded certain property to Mary and expressly denied Olin a lien on the same real estate that he now wishes to foreclose. The decree clearly states,

> 'that further, the nursing home, all the equipment, inventory, all personal items, real estate are set over to petitioner [Mary] including the residence next door at 623 Adams will be turned over to her as her sole property and that *respondent [Olin] have no further interest in said real estate at 623 or 625 Adams whatsoever'*

*Record* at 173 (emphasis supplied). Olin chose not to appeal this decree. We may not, after Mary's death, permit Olin to secure an interest in Mary's real estate that was denied him by the dissolution court. The dissolution court awarded Mary certain property in its decree and exercised its discretionary powers by withholding a lien on a particular tract of land. As these more specific statutes were designed to precisely meet the needs of the divorcing citizens of Indiana, we conclude that the dissolution statutes control over the more general judgment lien statute; hence, pursuant

to the specific language of the dissolution decree, no lien arose."

*Bell, supra,* at 627.

A concurring opinion in *Bell* cautioned against a reading of the case to indicate mutual exclusivity. It said:

> "Such an interpretation would be unwarranted.
>
> Under our opinion today, the trial court retains flexibility. The court may enter a monetary judgment with respect to a particular property distribution obligation and have that judgment attach as a lien upon real estate pursuant to I.C. 34–1–45–2. In addition thereto, the court may direct additional security under I.C. 31–1–11.5–15 for payment of a different obligation."

*Bell, supra,* at 628.

Clearly, the *Bell* court decided the case on the language in the decree which awarded the property free of any interest in it, thus negating a lien. This is within the power of the court under IND.CODE 31–1–11.5–15. *Bell* does not decide the question before us, because here there was no language either establishing or negating a lien.

■ From the above authorities there emerges the proposition that the court, by affirmative action, can either create a lien on real estate awarded to an obligated spouse to secure an alimony judgment, or negate such a lien. This is clear from IND.CODE 31–1–11.5–15, *Uhrick,* and *Bell.* If such affirmative action is taken, IND.CODE 34–1–45–2 is superseded. Thereupon, there exists the alternative of two propositions: (1) if the court takes no affirmative action to negate a judgment lien, does a lien automatically arise under IND.CODE 31–1–45–2; or (2) if the court takes no affirmative action to establish a judgment lien, is a lien denied the dissolution judgment creditor.

In *Uhrick,* the majority held that IND. CODE 34–1–45–2 did not fill the void and create a judgment lien where the decree did not affirmatively create or negate a judgment lien, but held that the divorce statute

controlled. The majority in *Bell* did not disagree with the result in *Uhrick*, but held that the court affirmatively negated a judgment lien. The statute under which *Uhrick* was decided is not materially different from IND.CODE 31–1–11.5–15; the prior statute differs in that only delinquent installments are subject to a lien unless the decree provides otherwise. Therefore, we can find no policy change. IND.CODE 34–1–45–2 did not augment IND.CODE 34–1–12–17 of the divorce statutes and it does not augment IND.CODE 31–1–11.5–15 of the dissolution statutes.

We believe *Uhrick* is controlling. The rationale expressed in *Bell* demonstrated that it is within the power of the trial court (and counsel in the event of an agreement) in dissolution of marriage cases to specifically tailor each decree to provide security to suit the purpose at hand. Certain properties can be impressed with a lien, but other properties can be transferred free of a lien. It is our opinion that this was, and is, the statutory scheme. We therefore hold that no lien ever attached to the Alexander property.

*Issue II. Continuing Guaranty.*

Ruth executed a continuing guaranty to the Bank on January 29, 1976, which provided for guaranty of Owen's debts, including present debts, future debts, renewals, extensions and alterations. The agreement also provided for the power of discontinuance of the continuing guaranty by Ruth upon notice. It did not provide for post-revocation extensions or alterations. Upon the dissolution of marriage, Ruth terminated the continuing guaranty on May 25, 1979, at which time Owen owed the Bank $86,248.00 secured by notes. Subsequent thereto, the Bank renewed the existing notes at a higher rate of interest without notice to Ruth or obtaining her consent. On March 4, 1980, the Bank cancelled the notes and combined them into one large note of $123,931.21. Interest on that note was 20.75% per annum. On March 6, 1980, the Bank released Ruth's home as collateral for one of the notes in existence at the time of the revocation of the continuing guaranty. In 1979, Owen was in good financial condition.

The Bank contends that Ruth remained liable on her continuing guaranty in spite of the post-revocation renewals and alterations of Owen's debts without her consent.

We said in *Goeke v. Merchants National Bank & Trust Co.* (1984), Ind. App., 467 N.E.2d 760, that the extent of a guarantor's liability is determined by his contract, which is interpreted the same as any other contract. The guarantor is a favorite in the law, and he is not bound beyond the strict terms of his engagement. His obligation cannot be extended by implication. As stated in *Carney v. Central National Bank of Greencastle* (1983), Ind. App., 450 N.E.2d 1034, ordinarily a surety is released if the creditor, without consent of the surety, renews the note, extends the time of payment, impairs the collateral, or alters the contract with the principal; prior consent contained in the instrument is sufficient to bind the surety.

The Bank correctly argues and cites authority for the proposition that a continuing guaranty is revocable, but a revocation does not release existing liability for past transactions. *Vidimos, Inc. v. Vidimos* (1980), Ind.App., 456 N.E.2d 455. However, the Bank cites no Indiana authority addressing the questions here of whether the revocation of the continuing guarantor freezes the obligations and rights of the parties as of the date of revocation, and whether such act discharges the guarantor according to the usual rules stated in *Carney, supra,* if the Bank thereafter, without consent of the guarantor, renews the obligation, extends the time of payment, or alters the contract.

Cases from other jurisdictions are divided. In a line of cases cited by Ruth, it is held in some jurisdictions that after revocation, any renewal, extension of time of payment, or alteration of the obligation creates a new indebtedness. A continuing guaranty does not cover post-revocation renewals, extensions, or alterations of obligations ex-

isting at the time of revocation and otherwise covered by the guaranty. Should this occur the guarantor is released. *Southern California First National Bank v. Olsen* (1974), 41 Cal.App.3d 234, 116 Cal.Rptr. 4; *Gandy v. Park National Bank* (1980), 200 Colo. 298, 615 P.2d 20; *Merchants National Bank v. Cressey* (1914), 164 Iowa 721, 146 N.W. 761; *Bank of United States v. Andron* (1934), 155 Misc. 21, 277 N.Y.S. 594; *Straus-Frank Co. v. Hughes* (1941), 138 Tex. 50, 156 S.W.2d 519; 38 C.J.S. *Guaranty* Sec. 36 (1943); 100 A.L.R. 1236 (1936). These cases proceed on the rationale that when a guarantor revokes the guaranty, his obligations to the creditor become fixed as of that date. The Bank, at the maturity of the existing loans if they are not paid, may proceed against the guarantor and collect the amount due. If the Bank accepts a renewal after the revocation it elects to be bound by the revocation, and it is presumed that it thereafter relied upon the credit of the principal and his security.

The Bank cites a number of cases which reach a different result. These are as follows: *Brenton Bank and Trust Company, Clarion v. Beisner* (1978), Iowa, 268 N.E.2d 196; *Corn Exchange Bank Trust Co. v. Gifford* (1935), 268 N.Y. 153, 197 N.E. 178; *Marking Systems, Inc. v. Interwest Film Corp.* (1977), Utah, 567 P.2d 176; *Exchange National Bank v. Hunt* (1913), 75 Wash. 513, 135 P. 224. The rationale expressed in these cases is as follows: The defendant has executed a revocable, continuing guaranty which is in fact revoked. The language of the guaranty is very broad and provides that the creditor could extend the time of payment, renew the obligation, release collateral, and the like without further consent of the guarantor or even notice to him. The guaranty also provides that any revocation will not release the guarantor for obligations incurred prior to revocation. In each case, after the revocation, renewals were made, contracts were altered, collateral released, or time of payment extended. Those cases construed the broad language of the guaranty to mean that the original debt remained even though the evidence of the debt, the note, was extended. Under the terms of the guaranty the creditor had a right to make extensions and renewals. Unless the terms of the guaranty specifically limit the obligations to extensions, renewals, releases of collateral, and alterations of the contract made and existing at or prior to the revocation, the creditor could make such extensions, renewals, contract alterations, or releases of collateral without releasing the guarantor.

 The rationale in the cases cited by the Bank is fundamentally flawed. The language contained in the guaranty which gives the Bank the powers, without the consent of or notice to the guarantor, to extend the time of payment, renew the obligation, release collateral, or alter the obligation, also terminates them by the guarantor's revocation. Nothing in the guaranty makes these rights divisible from the right to extend further credit and have them continue even though the right to extend further credit is terminated. We perceive that the purpose of the insertion of the right of revocation into a guaranty is to permit a guarantor to monitor the activities of his principal and, for whatever reason he deems best, terminate the guaranty if he feels his liability has become excessive, or that he has become overly exposed. Thus, the clear sense and implication of the language of the continuing guaranty, including the right to terminate, is that the rights to renew, extend the time of payment, release collateral, or alter the obligation must be exercised while the continuing guaranty is operative. Those conditions, as well as the right to extend further credit, or any other right to act in the future, cease upon revocation. The creditor may no longer rely upon those rights for future acts. The creditor's relationship with the guarantor becomes fixed or frozen, and at that point his relationship to the creditor becomes that of any creditor to his surety. When he renews the obligation, extends time of payment, releases collateral, or alters the agreement without notice

or consent, the guarantor is released. *See Carney, supra.*

The creditor, upon revocation, has the means to totally control his own destiny for he may at the time of revocation, and after the debt becomes delinquent, make demand upon and collect the same from the guarantor. If he chooses to forgo that safe option and rely upon his debtor, then under the usual rules of suretyship the guarantor is released. The courts in the cases cited by the Bank have extended the obligations under the continuing guaranty by implication. This we will not do.

The rules are especially applicable here. The guaranty was terminated in May 1979, at which time Owen was solvent. Yet the Bank continued to deal with Owen for nearly three years until he became bankrupt. No contact was made with Ruth, nor was any demand made upon her until the filing of the counterclaim on April 23, 1985.

We hold that Ruth was released from the guaranty, and therefore the renewal and extensions.

This cause is reversed as to Issue I and affirmed as to Issue II. The trial court is directed to amend its judgment granting the Bank priority as to the Alexander property.

Judgment affirmed in part, and reversed in part.

ROBERTSON, P.J., and RATLIFF, J., concur.